**CARPER v. VWR SCIENTIFIC PRODUCTS**     **MICHELLE R. CARPER**     **3-10-05**

**DelCASALE, CASEY, MARTIN & MANCHELLO**

**Page 1 to Page 203**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*DEL CASALE, CASEY, MARTIN & MANCHELLO*
*Eight Penn Center, Suite 402*
*1628 JFK BLVD*
*Philadelphia, PA    19103*
*Phone:   215-568-2211*
*FAX:   215-568-2622*

EXHIBIT 1

## Page 9

(1) live with you?

(2) **A.** No.

(3) **Q.** Other than Mr. Rivera, has there been

(4) anyone else who has lived with you while you lived

(5) at the Bridgeton address?

(6) **A.** No.

(7) **Q.** What is the disability that you claim

(8) that you have?

(9) **A.** It's an SI joint dysfunction.

(10) **Q.** SI joint dysfunction?

(11) **A.** Yes.

(12) **Q.** Who diagnosed that condition?

(13) **A.** Dr. Evan O'Brien.

(14) **Q.** When did Dr. O'Brien diagnose the

(15) condition?

(16) **A.** November '02.

(17) **Q.** November 2002?

(18) **A.** Yes.

(19) **Q.** Are you still under Dr. O'Brien's

(20) care?

(21) **A.** Yes.

(22) **Q.** And have you continuously been under

(23) his care since at least November of 2002?

(24) **A.** Yes.

## Page 10

(1) **Q.** When did you first see Dr. O'Brien?

(2) **A.** I want to say October.

(3) **Q.** Of that same year?

(4) **A.** Yes.

(5) **Q.** Where in your body is the SI joint

(6) located?

(7) **A.** It's the right lower side of my back.

(8) **Q.** Is there any other disability that you

(9) claim in connection with this lawsuit?

(10) **A.** No.

(11) **Q.** Is Dr. O'Brien a back specialist?

(12) **A.** Yes.

(13) **Q.** Prior to October of 2002, did you ever

(14) consult any other back specialists?

(15) **A.** No.

(16) **Q.** When did you first begin to experience

(17) problems with your back?

(18) **A.** Oh, March of 2002.

(19) **Q.** Prior to that time, had you ever had

(20) any discomfort with your back?

(21) **A.** No.

(22) **Q.** None whatsoever?

(23) **A.** No.

(24) **Q.** Let me ask you that, in the records of

## Page 11

(1) VWR, there is a record in September of 2001 that you

(2) had called off sick that day and that you had

(3) requested emergency vacation, and I will read from

(4) the document, "In order to pick up medical records

(5) for a pending legal case."

(6) Do you know what that refers to?

(7) **A.** September 2001?

(8) **Q.** September 6, 2001.

(9) **A.** No, I don't know, 2001.

(10) **Q.** There was no case at or around that

(11) time that you personally were involved in?

(12) **A.** September 2001. No.

(13) **Q.** Any member of your family involved in

(14) any lawsuit or any legal case that you can recall?

(15) **A.** I can't recall anything right now.

(16) **Q.** Any reason why you'd be picking up

(17) medical records at that time?

(18) **A.** No.

(19) **Q.** To your knowledge, were you

(20) experiencing any kind of medical problem at or

(21) around that time?

(22) **A.** Not September 2001, no.

(23) **Q.** Did you graduate from high school?

(24) **A.** No.

## Page 12

(1) **Q.** What is the highest level of education

(2) that you've attained?

(3) **A.** Twelfth.

(4) **Q.** Twelfth grade?

(5) **A.** Yes.

(6) **Q.** But didn't get the diploma?

(7) **A.** No.

(8) **Q.** Did you drop out?

(9) **A.** No.

(10) **Q.** What happened?

(11) **A.** I didn't finish. I just went all the way

(12) and didn't finish.

(13) **Q.** Have you ever pursued the diploma

(14) since?

(15) **A.** No.

(16) **Q.** Can you go through, in terms of after

(17) you ended your school experience – what year was

(18) that?

(19) **A.** '79.

(20) **Q.** What was the first job you held after

(21) that?

(22) **A.** It was in California.

(23) **Q.** Do you recall who your employer was?

(24) **A.** No, I don't.

## Page 17

(1) rehired into?

(2) **A.** Shipping.

(3) **Q.** What was your title?

(4) **A.** Shipper.

(5) **Q.** And can you describe for me the job

(6) duties you had as a shipper at VWR?

(7) **A.** Pack DuPont items and ship them out to the

(8) locations they're going out to.

(9) **Q.** And what kind of activities would you

(10) need to engage in to accomplish those tasks?

(11) **A.** Like what, like boxes or packing?

(12) **Q.** Yes. I mean in terms of what's the

(13) activity that you engage in to kind of pack

(14) something and to ship it? What do you physically

(15) do?

(16) **A.** Size it up, to see in the box, pack it;

(17) tape it, label it, and if it's heavy, we would have

(18) to -- we usually call for a track, if it's real

(19) heavy, for a track company to come get it and take

(20) it to where it used to go.

(21) **Q.** And what do you mean by heavy?

(22) **A.** Like if it was a crate.

(23) **Q.** Do you associate the word heavy with a

(24) certain poundage or approximate poundage?

## Page 18

(1) **A.** It depends on the crate. I guess 50 plus,

(2) I guess for a crate.

(3) **Q.** And for items that were less than

(4) 50 pounds, what's the physical activity that you

(5) would engage in?

(6) **A.** Just get ready for the delivery trucks

(7) that come pick it up, like Airborne or Fed-Ex to

(8) come pick the box up, just get them prepped and

(9) ready for it to go out.

(10) **Q.** As part of your job, were you required

(11) to lift anything?

(12) **A.** Yes.

(13) **Q.** What were you required to lift?

(14) **A.** We have to lift an item, put it in the

(15) box, and use a dolly to move the box out to the

(16) docking area.

(17) **Q.** And is it fair for me to conclude that

(18) you were required to lift items up to approximately

(19) 50 pounds?

(20) **A.** Yes.

(21) **Q.** Other than lifting, what other

(22) physical activities were you required to do?

(23) **A.** Restock boxes, I did some receiving and

(24) when boxes would come in or we'd receive some

items.

## Page 19

(1) **Q.** Now, were you standing, sitting,

(2) combination of both? How did you do the job?

(3) **A.** It's mostly standing.

(4) **Q.** Mostly standing?

(5) **A.** Mm-hmm.

(6) **Q.** Did you ever have to do any bending?

(7) **A.** Bending, squating, kneeling.

(8) **Q.** How frequently would you need to, as

(9) you say, bending, squating, kneeling?

(10) **A.** Every time I had to pack a box. If I

(11) couldn't do it, like, on a table, we would have to

(12) pack a box on the floor.

(13) **Q.** So that was something that you would

(14) do consistently with your job?

(15) **A.** Yes.

(16) **Q.** It was an integral part of your job?

(17) **A.** Mm-hmm.

(18) **Q.** Is that a yes?

(19) **A.** Yes.

(20) **Q.** And in terms of going back to the

(21) requiring, in terms of the lifting, was that

(22) something that you did frequently as well?

(23) **A.** Yes.

(24) **Q.** Of varying poundage up to

## Page 20

(1) approximately 50 pounds?

(2) **A.** Yes.

(3) **Q.** And that would have been something

(4) that you would have done on a routine basis?

(5) **A.** Yes.

(6) **Q.** And, again, that would have been

(7) something that would have been an integral part of

(8) the job?

(9) **A.** Yes.

(10) **Q.** And in terms of stocking boxes, you

(11) mentioned stocking boxes, what do you mean by

that?

(12) **A.** Some times the boxes would come in, and

(13) we'd use the forklift some time to stock the boxes

(14) on the shelves we have in the warehouse or just

(15) stock items, you know, in the area where we are.

(16) **Q.** So would you have to climb. Would you

(17) have to use a ladder or some other mechanism to get

(18) up to higher shelves?

(19) **A.** Just the forklift. We'd use a forklift.

(20) **Q.** So there was no climbing associated

(21) with your job?

(22) **A.** I would have to climb some times to get a

(23) box if I didn't have it down there on the floor.

(24) **Q.** When you would climb, what's the

## Page 21

(1) mechanism that you would use to get higher?
(2)   **A.**   The ladder.
(3)   **Q.**   How often would that happen?
(4)   **A.**   Not often.
(5)   **Q.**   So distinct from the bending and the
(6) lifting, the climbing was something that happened,
(7) is it fair to say, occasionally?
(8)   **A.**   Yes.
(9)   **Q.**   Now, was there any driving associated
(10) with your job at all? Did you have any driving
(11) responsibility?
(12)   **A.**   No.
(13)   **Q.**   You mentioned a forklift. You didn't
(14) operate the forklift, did you?
(15)   **A.**   Yes.
(16)   **Q.**   Was that a routine part of your job?
(17)   **A.**   It was required of the job.
(18)   **Q.**   Was it a routine part of what you did
(19) on a day-to-day basis?
(20)   **A.**   Yes.
(21)   **Q.**   So am I to understand by that each and
(22) every day there would be occasion for you to operate
(23) the forklift?
(24)   **A.**   Yes.

## Page 22

(1)   **Q.**   Did you have to, as part of your job
(2) did you have to carry things, separate and apart
(3) from lifting, did you have to carry things from one
(4) place to another? Was that anything that you had to
(5) do?
(6)   **A.**   Yes.
(7)   **Q.**   And what would you be required as part
(8) of your job as a shipper to carry?
(9)   **A.**   Boxes out to the dock or from shipping to
(10) receiving or vice versa.
(11)   **Q.**   And, again, these would be boxes whose
(12) weight was less than the approximate 50 pounds that
(13) you told me of earlier?
(14)   **A.**   Yes.
(15)   **Q.**   And how far a distance are we talking,
(16) Ms. Carper, in terms of your carrying things out to
(17) the dock area?
(18)   **A.**   About half this room size.
(19)   **Q.**   So what are –
(20)   **A.**   Like from the curtain to there.
(21)   **Q.**   So that looks to be about 15,
(22) 20 yards; is that about right?
(23)   **MR. FANNON:**   Feet.
(24)   **MS. LEVERING:**   Feet. I'm sorry.

## Page 23

(1)   **THE WITNESS:**   Yes.
(2)   **BY MS. LEVERING:**
(3)   **Q.**   Would that be right?
(4)   **A.**   Yes.
(5)   **Q.**   Was there any pushing or pulling
(6) involved in the responsibilities of your job as
(7) shipper?
(8)   **A.**   Yes.
(9)   **Q.**   Can you explain what you did?
(10)   **A.**   When I have to send stuff out on a pallet,
(11) we have to wrap it up in plastic and use a jack to
(12) push and pull, whatever, to put it out there on the
(13) loading dock.
(14)   **Q.**   How often would you have to engage in
(15) that activity?
(16)   **A.**   Occasionally.
(17)   **Q.**   So by occasionally, do I understand
(18) you mean not every day?
(19)   **A.**   Right.
(20)   **Q.**   But maybe a few times a week?
(21)   **A.**   Right, yes.
(22)   **Q.**   Would it be more than that?
(23)   **A.**   No.
(24)   **Q.**   On the carrying function that you

## Page 24

(1) described for me, in terms of carrying the boxes to
(2) the dock of a distance approximately 15 to 20 feet,
(3) how often would you do that?
(4)   **A.**   I'm sorry. What was that again?
(5)   **Q.**   In terms of carrying the boxes to the
(6) dock, how often would you do that as part of your
(7) job as a shipper?
(8)   **A.**   Once a day.
(9)   **Q.**   So that was part of the daily routine?
(10)   **A.**   Yes.
(11)   **Q.**   Any other physical activities or
(12) responsibilities, other than the ones that you've
(13) described for me, that were part of your job as a
(14) shipper at VWR?
(15)   **A.**   Just besides filling in once in a while
(16) for the receiver, that's all.
(17)   **Q.**   When you say fill in for the receiver,
(18) that wasn't part of the shipper job, but on occasion
(19) you would substitute?
(20)   **A.**   Yes.
(21)   **Q.**   What does a receiver do?
(22)   **A.**   Receives in the boxes. And I would have
(23) to check them in, scan them in, receive them in, and
(24) then put them in their various locations on the

**Page 25**

(1) shelves to be distributed.
(2)    **Q.**    Anything else, to your understanding,
(3) that a receiver did?
(4)    **A.**    No.
(5)    **Q.**    To your knowledge, did the receiver
(6) engage in any of the activities that you've
(7) described as part of your job as the shipper?
(8)    **A.**    No.
(9)    **Q.**    Now, you were hired into the shipper
(10) position in August of 2001, and is it fair for me to
(11) understand that the job descriptions or the duties
(12) and activities that you've described for me in
(13) connection with the shipper job were the job
(14) responsibilities from the time that you first took
(15) the position?
(16)    **A.**    Yes.
(17)    **Q.**    Through the time that you last worked
(18) in that position?
(19)    **A.**    Yes.
(20)    **Q.**    Let me ask it differently. Is it fair
(21) for me to conclude that that's an accurate
(22) description of the activities from August 2001 until
(23) at least February of 2002 – I'm sorry – 2003?
(24)    **A.**    Yes.

**Page 26**

(1)    **Q.**    Now, help me understand the operation
(2) in the warehouse. You indicated that you were
(3) initially assigned to the Beech Street location?
(4)    **A.**    Yes.
(5)    **Q.**    And did you work alone, or in a team?
(6)    **A.**    Well, I'm the only shipper; I worked with
(7) my supervisor.
(8)    **Q.**    So the working unit, you have you as
(9) the shipper, your supervisor, and who was your
(10) supervisor when you first started at Beech Street?
(11)    **A.**    Keith Steed.
(12)    **Q.**    Were there other employees that were
(13) part of this working unit in the warehouse, other
(14) than you and Mr. Steed, that were part of your
(15) working unit?
(16)    **A.**    Just one receiver and trucker, we had a
(17) trucker.
(18)    **Q.**    Was there any other shipper other than
(19) you?
(20)    **A.**    No.
(21)    **Q.**    And you had one receiver and one
(22) trucker?
(23)    **A.**    Yes.
(24)    **Q.**    And one supervisor and one shipper?

**Page 27**

(1)    **A.**    Right.
(2)    **Q.**    And that was the unit as of August
(3) 2001 at Beech Street. Was that also in terms of the
(4) job positions, maybe not the identity of the
(5) individuals, but in terms of the job positions, was
(6) that also the working unit at the time that you last
(7) worked at Beech Street?
(8)    **A.**    Yes.
(9)    **Q.**    And when was the last time you worked
(10) at Beech Street?
(11)    **A.**    I want to say August 2002.
(12)    **Q.**    Now, throughout that period of August
(13) of 2001, until August of 2002, as you say, was
(14) Mr. Steed your supervisor throughout that entire
(15) period?
(16)    **A.**    Yes.
(17)    **Q.**    No one substituted for him during that
(18) time?
(19)    **A.**    No.
(20)    **Q.**    And you were the sole shipper during
(21) that time as well?
(22)    **A.**    Yes.
(23)    **Q.**    And the receiver, who was the
(24) receiver?

**Page 28**

(1)    **A.**    Jamie Coffin.
(2)    **Q.**    Man or a women?
(3)    **A.**    Man.
(4)    **Q.**    And he was the receiver at the time
(5) that you first worked at Beech Street? If you
(6) recall.
(7)    **A.**    I want to say yes, but I don't recall.
(8)    **Q.**    Is it fair to say you don't remember
(9) him being there the entire time that you were there
(10) at the Beech Street location?
(11)    **A.**    Right.
(12)    **Q.**    At the time that you last worked at
(13) the Beech Street location, was Mr. Coffin still
(14) working as the receiver there?
(15)    **A.**    No.
(16)    **Q.**    Was he still with the company?
(17)    **A.**    Yes.
(18)    **Q.**    To your knowledge. Had he moved on to
(19) a different location?
(20)    **A.**    They relocated him, transferred him.
(21)    **Q.**    Do you know the circumstances of that?
(22)    **A.**    No.
(23)    **Q.**    Was someone else brought in to replace
(24) him as the receiver at Beech Street?

Page 29

(1) **A.** Yes.

(2) **Q.** And do you recall that person?

(3) **A.** No.

(4) **Q.** Whoever that person was, did that
(5) person work with you until you last worked at Beech
(6) Street in August of 2002?

(7) **A.** Yes.

(8) **Q.** And how about the trucker, at the time
(9) that you came to the Beech Street location in
(10) approximately August of 2001, do you recall the
(11) identity of the person who held the job of trucker?

(12) **A.** Jerome Saunders, Saunders.

(13) **Q.** And do you have any knowledge of what
(14) the trucker's responsibilities are, what he is
(15) supposed to do?

(16) **A.** Deliver what comes in from the receiving
(17) side.

(18) **Q.** Does he operate the forklift? If you
(19) know.

(20) **A.** Yes, yes. Yes, he does.

(21) **Q.** Was Mr. Saunders still working in the
(22) position of trucker at Beech Street at the time you
(23) last worked at Beech Street in August of 2002?

(24) **A.** Yes.

Page 30

(1) **Q.** Now, other than your, in terms of
(2) going back to your work history, other than the jobs
(3) that you described for me that you say that you
(4) resigned or quit, are there any other jobs that you
(5) have resigned from or quit from?

(6) **A.** No.

(7) **Q.** Now, my understanding is that at some
(8) point in time, and I want to explore with you when,
(9) you claim that you were unable to perform the job of
(10) a shipper at VWR; is that right?

(11) **A.** Right.

(12) **Q.** And you've described for me in terms
(13) of when you first saw Dr. O'Brien in approximately
(14) October of 2002?

(15) **A.** Yes.

(16) **Q.** And when do you contend that you
(17) became unable to perform the job of a shipper at
(18) VWR?

(19) **A.** When did I contend?

(20) **Q.** No. I'm just trying to narrow in
(21) terms of when. We know you had back problems, and I
(22) asked you when you first went to Dr. O'Brien, you
(23) told me when you did that, and my notes show that it
(24) was in approximately October of 2002, and you had

Page 31

(1) indicated to me that Dr. O'Brien diagnosed you with
(2) SI joint dysfunction?

(3) **A.** Yes.

(4) **Q.** In November of 2002?

(5) **A.** Yes.

(6) **Q.** Is that when you became unable to
(7) perform the job of a shipper at VWR?

(8) **MS. JONES:** I'm going to object
(9) to the form of the question. You listed
(10) two dates. Could you clarify which date
(11) you are talking about?

(12) **MS. LEVERING:** I will ask it
(13) more generically. I was just trying to
(14) help her.

(15) **BY MS. LEVERING:**

(16) **Q.** When did you first become unable to
(17) perform the job of shipper at VWR?

(18) **A.** I guess about January, February.

(19) **Q.** Of what year?

(20) **A.** I'd say around December of 2002.

(21) **Q.** December of 2002?

(22) **A.** Yes.

(23) **Q.** So is it fair for me to conclude that
(24) since December of 2002, you've continuously been

Page 32

(1) unable to perform the job of shipper?

(2) **A.** Yes.

(3) **Q.** And by that do I understand, were
(4) there – let me ask it this way. When did you first
(5) hurt your back?

(6) **A.** March of 2002.

(7) **Q.** And how did you hurt your back?

(8) **A.** Lifting a box.

(9) **Q.** And where were you when you were
(10) lifting the box?

(11) **A.** In the warehouse at Beech Street.

(12) **Q.** What kind of box were you lifting?

(13) **A.** Say the size of a computer box.

(14) **Q.** And approximately how heavy was it?

(15) **A.** About 30 pounds.

(16) **Q.** Do you recall the day of the week when
(17) this happened?

(18) **A.** It was on a Friday.

(19) **Q.** And why do you recall that so vividly?

(20) **A.** It was just on a Friday, and it was the
(21) weekend, I didn't work the next day, so it was a
(22) Friday, the 15th.

(23) **Q.** Friday, the 15th of March?

(24) **A.** Yes.

## Page 37

(1)   Q.   When you say rest, you're not
(2)   suggesting you stayed in bed the entire weekend,
are
(3)   you?
(4)   A.   No.
(5)   Q.   Wouldn't we all love to have that
(6)   situation.
(7)   A.   Just lounged around the house. I didn't
(8)   do no housework or nothing, didn't go anywhere.
(9)   Q.   Did you do any physical activity in
(10)  the house at all?
(11)  A.   No.
(12)  Q.   Did you cook?
(13)  A.   Mm-mm.
(14)  Q.   I'm sorry?
(15)  A.   No.
(16)  Q.   No? Okay. Did you make yourself any
(17)  food?
(18)  A.   Sandwich, you know, light.
(19)  Q.   Were you able to walk from one room to
(20)  another room in your home?
(21)  A.   Yes.
(22)  Q.   I'm just thinking of the things I do
(23)  on a weekend, so I will ask you a series of things.
(24)  Did you do any laundry?

## Page 38

(1)   A.   No.
(2)   Q.   Did you talk to anybody on the phone?
(3)   A.   No.
(4)   Q.   Jim happens to know I love to garden.
(5)   Did you do any gardening?
(6)   A.   No.
(7)   Q.   Were you able to bend?
(8)   A.   Well, it pained, yes.
(9)   Q.   Were you able to lift anything of any
(10)  weight?
(11)  A.   No.
(12)  Q.   No?
(13)  A.   I wasn't going to attempt it, no.
(14)  Q.   So am I to understand you didn't go
(15)  out the entire weekend?
(16)  A.   Right.
(17)  Q.   Was there anyone else home with you
(18)  that weekend?
(19)  A.   My roommate.
(20)  Q.   This is Jim Rivera?
(21)  A.   Yes.
(22)  Q.   Was he there the entire time?
(23)  A.   He works on the weekends.
(24)  Q.   Where does he work?

## Page 39

(1)   A.   He is a correctional officer at a state
(2)   prison.
(3)   Q.   And reflecting back in this time frame
(4)   of March of 2002, what were his weekend work
hours?
(5)   A.   7:30 to 3:30.
(6)   Q.   Working both Saturday and Sunday?
(7)   A.   Yes.
(8)   Q.   Did you get him to cook for you?
(9)   A.   I got him to go out and go get something
(10)  to eat.
(11)  Q.   Did you get him to do laundry?
(12)  A.   No.
(13)  Q.   I know you say you didn't talk to
(14)  anyone on the weekend, but I just want to be clear
(15)  about this, and I know you say you didn't go out at
(16)  all that weekend, so am I to understand that you
(17)  didn't seek any medical attention at all over the
(18)  course of that weekend?
(19)  A.   Right.
(20)  Q.   What did you do when you went back to
(21)  work on Monday? What time does your shift start?
(22)  A.   7:30.
(23)  Q.   So what did you do when you went back
(24)  to work?

## Page 40

(1)   A.   Get ready for the day, and whatever was
(2)   in, do the ship work, or just basically waiting for
(3)   the work.
(4)   Q.   Did you ever fail to do any of the
(5)   activities that you've described for me are
(6)   necessary functions of the job as a shipper on the
(7)   day that you first returned to work?
(8)   A.   No.
(9)   Q.   So you were bending?
(10)  A.   Yes.
(11)  Q.   You were kneeling, you were squating;
(12)  you were climbing a ladder as you needed to, if you
(13)  needed to stock something or reach something?
(14)  A.   Yes.
(15)  Q.   You were lifting up to approximately
(16)  50 pounds?
(17)  A.   Yes.
(18)  Q.   You were doing the pushing and pulling
(19)  that you described for me before?
(20)  A.   Yes.
(21)  Q.   On that Monday when you returned to
(22)  work, did you have any conversations with your
(23)  co-workers about what you say had occurred on the
(24)  preceding Friday?

## Page 53

(1)   **A.**   Yes.

(2)   **Q.**   And can you separate out one
(3) conversation from the other, or do they blend
(4) together for you?

(5)   **A.**   They blend together.

(6)   **Q.**   Why don't you tell me what you recall
(7) of what you said to him?

(8)   **A.**   At one time my back was burning when I was
(9) lifting some boxes, and just the bending part was
(10) aggravating.

(11)   **Q.**   I understand this is what you say
(12) you're feeling. Are you communicating this to
(13) Mr. Steed?

(14)   **A.**   Yes.

(15)   **Q.**   Anything else you recall saying to
(16) him?

(17)   **A.**   No.

(18)   **Q.**   What, if anything, did he say in
(19) response?

(20)   **A.**   "Okay," and "Do what you can do."

(21)   **Q.**   During the times that you spoke with
(22) Mr. Steed, did you find him to be anything other
(23) than concerned about what you were telling him?

(24)   **A.**   Yes.

## Page 54

(1)   **Q.**   Did you find him to be anything other
(2) than sympathetic to what you were telling him?

(3)   **A.**   Was he sympathetic?

(4)   **Q.**   Mm-hmm.

(5)   **A.**   Yes.

(6)   **Q.**   He was sympathetic?

(7)   **A.**   Yes.

(8)   **Q.**   And is it fair to say he was
(9) concerned?

(10)   **A.**   Yes.

(11)   **Q.**   Other than Mr. Saunders and Mr. Steed,
(12) was there anyone else at VWR that in the week
(13) succeeding the Friday when you hurt your back that
(14) you spoke with about the back or the incident that
(15) led to your hurting your back?

(16)   **A.**   No.

(17)   **Q.**   Now, in terms of the lifting that you
(18) do in connection with your shipping job, you
(19) mentioned that you were required to lift,
(20) approximately, boxes or things of approximately up
(21) to approximately 50 pounds.
(22) Were you ever told that there
(23) was kind of help available if you needed some help
(24) in lifting something?

## Page 55

(1)   **A.**   Prior to the back?

(2)   **Q.**   Mm-hmm. Yes.

(3)   **A.**   No.

(4)   **Q.**   You were never told?

(5)   **A.**   Mm-mm.

(6)   **Q.**   Did you receive any training?

(7)   **A.**   Just on-the-job training.

(8)   **Q.**   So when you became reemployed at VWR
(9) in August of 2001, you were immediately assigned to
(10) the Beech Street location?

(11)   **A.**   There was a location before, but I was
(12) only there for like 2 days. I can't remember what
(13) location it was.

(14)   **Q.**   Do you recall that you were trained
(15) during that time?

(16)   **A.**   Yes.

(17)   **Q.**   What did the training consist of?

(18)   **A.**   What type of chemicals we can and can't
(19) ship, hazardous, things of that sort, and how to
(20) pack the glasses and stuff.

(21)   **Q.**   Was there any discussion about safety?

(22)   **A.**   Yes.

(23)   **Q.**   Any discussion about safety as it
(24) related to lifting boxes or certain weights?

## Page 56

(1)   **A.**   No.

(2)   **Q.**   Is it that you are not recalling it,
(3) or you are telling me it didn't happen?

(4)   **A.**   I'm not recalling it.

(5)   **Q.**   Prior to the time you say you hurt
(6) your back, did you ever ask for any assistance in
(7) lifting anything in connection with your job as
(8) shipper at VWR?

(9)   **A.**   Pushing the pallets. I needed help with
(10) that, because they were kind of heavy to push.

(11)   **Q.**   And what would be the approximate
(12) weight?

(13)   **A.**   Hundreds of pounds.

(14)   **Q.**   Who did you seek assistance from?

(15)   **A.**   Whoever was available.

(16)   **Q.**   And did you get that assistance?

(17)   **A.**   Yes.

(18)   **Q.**   Is it fair to say that's the only time
(19) you solicited help?

(20)   **A.**   Mm-hmm. Yes.

(21)   **Q.**   During your association with
(22) Mr. Steed, did you find him to be a compassionate
(23) man?

(24)   **A.**   Yes.

## Page 57

(1) **Q.** Did you find him to be an honest man?

(2) **A.** Yes.

(3) **Q.** Did you find him to be a fair man?

(4) **A.** Yes.

(5) **Q.** Did you ever have any reason to doubt

(6) his honesty?

(7) **A.** No.

(8) **Q.** How about Mr. Saunders, did you find

(9) Mr. Saunders to be an honest person?

(10) **A.** Yes.

(11) **Q.** Any reason to doubt his honesty?

(12) **A.** No.

(13) **Q.** Did you ever tell Mr. Steed that you

(14) had hurt your back during a wild weekend with your

(15) roommate?

(16) **A.** No.

(17) **Q.** You never did?

(18) **A.** Did I tell him that?

(19) **Q.** Yes.

(20) **A.** They assumed, but I didn't tell them.

(21) **Q.** What do you mean they assumed?

(22) **A.** Since I hurt my back they, I guess,

(23) figured it was funny that I had a wild weekend.

(24) **Q.** Did they tell you that?

## Page 58

(1) **A.** Mm-hmm.

(2) **Q.** Did they?

(3) **A.** Yes.

(4) **Q.** When did they tell you that?

(5) **A.** After I injured my back.

(6) **Q.** When?

(7) **A.** March.

(8) **Q.** So we know from your earlier testimony

(9) that it wasn't in your conversation with Mr. Steed

(10) on that Friday, and we know it wasn't in your

(11) conversation with Mr. Saunders or Mr. Steed in the

(12) following week.

(13) When, then, do you say that

(14) Mr. Steed laughed about your having hurt your back

(15) on a wild weekend?

(16) **A.** I don't recall the day.

(17) **Q.** Do you recall the month?

(18) **A.** March.

(19) **Q.** Why don't you reconstruct what was

(20) going on at the time you say you had this

(21) conversation with Mr. Steed?

(22) **A.** When I was talking about the pain, and,

(23) you know, I was walking funny, and I guess they

(24) assumed that I had a wild weekend that weekend,

## Page 59

(1) because it hurt to walk.

(2) **Q.** When you had this conversation with

(3) Mr. Steed, where did you have it?

(4) **A.** In the warehouse.

(5) **Q.** Where in the warehouse?

(6) **A.** Shipping.

(7) **Q.** Was it in his office or not in his

(8) office?

(9) **A.** Not in the office.

(10) **Q.** So it was out in the open?

(11) **A.** Yes.

(12) **Q.** Was there anyone else present during

(13) the time you had this conversation with Mr. Steed?

(14) **A.** Jerome.

(15) **Q.** Jerome Saunders?

(16) **A.** Yes.

(17) **Q.** Anyone other than Mr. Saunders?

(18) **A.** No.

(19) **Q.** What specifically do you recall

(20) Mr. Steed saying on that occasion?

(21) **A.** I don't recall exact words. Somebody had

(22) a wild weekend over the weekend.

(23) **Q.** Do you recall specifically he used the

(24) word "wild weekend"?

## Page 60

(1) **A.** No.

(2) **Q.** No?

(3) **A.** No.

(4) **Q.** What did you say, if anything, in

(5) response?

(6) **A.** Just laughed it off.

(7) **Q.** You laughed it off?

(8) **A.** Mm-hmm.

(9) **Q.** That's a yes?

(10) **A.** I'm sorry. Yes.

(11) **Q.** Did the conversation on that subject

(12) continue after you laughed it off?

(13) **A.** No.

(14) **Q.** Mr. Saunders was present during this

(15) exchange with Mr. Steed?

(16) **A.** Yes.

(17) **Q.** And did he say anything?

(18) **A.** I don't recall.

(19) **Q.** Do you recall his laughing at any time

(20) during the conversation?

(21) **A.** Yes.

(22) **Q.** And when during the conversation did

(23) he laugh?

(24) **A.** After the comment was made.

## Page 69

(1)    **Q.**    And why don't you, as best you can,
(2)    kind of reconstruct the call between the two of you?
(3)    **A.**    I was calling to see what my options were
(4)    for going on disability, and I told him what had
(5)    happened, and he said he had no knowledge of it at
(6)    that time.
(7)    So I would have to – he told me
(8)    to tell Keith to call him to talk about what had
(9)    happened.
(10)    **Q.**    Anything else you recall from your
(11)    first conversation with Mr. Knepper?
(12)    **A.**    Not that first call, no.
(13)    **Q.**    So did you relay Mr. Knepper's request
(14)    that Mr. Steed give him a call?
(15)    **A.**    Yes.
(16)    **Q.**    Did you do that in person?
(17)    **A.**    Yes.
(18)    **Q.**    Tell me what you said to Mr. Steed.
(19)    **A.**    That he needed to call Steve Knepper to
(20)    fill out an accident report.
(21)    **Q.**    Do you recall saying anything else to
(22)    Mr. Steed?
(23)    **A.**    No.
(24)    **Q.**    And this is also in July of 2002?

## Page 70

(1)    **A.**    Yes.
(2)    **Q.**    And when was the next time you talked
(3)    to Mr. Knepper?
(4)    **A.**    I believe it was 2 days later.
(5)    **Q.**    And you called him?
(6)    **A.**    I think he called me first.
(7)    **Q.**    Okay. When the two of you connected,
(8)    what was discussed?
(9)    **A.**    Do the accident report, to follow up on
(10)    the accident report, and then I would have to talk
(11)    to their workmen's comp liability, Mutual Liberty
(12)    people.
(13)    **Q.**    Anything else you recall of the
(14)    conversation with Mr. Knepper or the second
(15)    conversation?
(16)    **A.**    No.
(17)    **Q.**    Do you recall asking him any
(18)    questions?
(19)    **A.**    No.
(20)    **Q.**    Other than his telling you that you
(21)    needed to talk with the folks from Liberty Mutual,
(22)    and you needed to complete an accident report,
(23)    anything else you recall his saying to you?
(24)    **A.**    No.

## Page 71

(1)    **Q.**    And then you weren't sure in terms of
(2)    whether there was a third conversation, but having
(3)    gone through the first two, do you recall another
(4)    one?
(5)    **A.**    No, I'm not sure.
(6)    **Q.**    Now, in connection with the
(7)    conversations you had with Mr. Knepper, and any of
(8)    the conversations we've talked about, the one you
(9)    had with Finocchairo, the various conversations you
(10)    said you had with Mr. Steed or Mr. Saunders or
(11)    Mr. Coffin or anyone else you identified, did you
(12)    ever make any notes of any of these conversations?
(13)    **A.**    Notes of the conversations, no.
(14)    **Q.**    Do you have any records of any kind
(15)    that in any way reflect the content of the
(16)    conversations that you've described for me today?
(17)    **A.**    No.
(18)    **Q.**    Did you keep any diary of the
(19)    conversations, not so much in terms of content, but
(20)    the dates on which conversations may have
occurred?
(21)    **A.**    No.
(22)    **Q.**    So there is no record, there is no
(23)    diary, there is no log, or anything of that sort; is
(24)    that right?

## Page 72

(1)    **A.**    Right.
(2)    **Q.**    Did you follow Mr. Knepper's
(3)    instruction and complete an accident report?
(4)    **A.**    Yes.
(5)    **MS. LEVERING:**    I'm going to ask
(6)    the reporter if he'd be good enough to
(7)    mark as Defendant's Exhibit 1 a 2-page
(8)    document entitled Employee's Report of
(9)    Industrial Accident, that purports to be
(10)    signed by Ms. Carper and dated July 30,
(11)    2002.
(12)    (Whereupon D-1 was marked for
(13)    identification.)
(14)    **BY MS. LEVERING:**
(15)    **Q.**    All right. Ms. Carper, you have
(16)    before you what we've marked as Defendant's
(17)    Exhibit 1. Why don't you take a moment to look at
(18)    that?
(19)    (Brief pause.)
(20)    **BY MS. LEVERING:**
(21)    **Q.**    Have you had a chance to look that
(22)    over?
(23)    **A.**    Yes.
(24)    **Q.**    Now, looking at the second page, there

## Page 73

(1) is a signature line there. Is that your signature?

(2) **A.** Yes.

(3) **Q.** And is the handwriting on the document

(4) yours?

(5) **A.** Yes.

(6) All of the handwriting, except for

(7) Mr. Steed's –

(8) **A.** Steed's signature.

(9) **Q.** – signature on the bottom of the

(10) second page?

(11) **A.** Yes.

(12) **Q.** It's dated 7/30/2002. Was that the

(13) date that you filled out the various information

(14) that appears on the document?

(15) **A.** Yes.

(16) **Q.** Who gave you the form to complete?

(17) **A.** Mr. Steed.

(18) **Q.** Were you given any instructions as to

(19) how to complete the form?

(20) **A.** No.

(21) **Q.** I'm sorry?

(22) **A.** No. Just fill it out.

(23) **Q.** Did you complete it while at work?

(24) **A.** Yes.

## Page 74

(1) **Q.** Was anyone else with you when you

(2) completed it?

(3) **A.** No.

(4) **Q.** Is the information that you recorded

(5) on the document accurate?

(6) **A.** Yes.

(7) **Q.** Do you see on the first page of the

(8) document where it asks you to name any witnesses to

(9) the incident and you indicate none? This is kind of

(10) towards the bottom of the page.

(11) **A.** Yes.

(12) **Q.** Five items up. Does that now refresh

(13) your memory that Mr. Coffin was not there?

(14) **A.** I put no because I wasn't sure if he was

(15) there or not.

(16) **Q.** What did you do with the document

(17) after you filled it out?

(18) **A.** Gave it to Keith.

(19) **Q.** Was there any discussion between you

(20) and Mr. Steed about the document?

(21) **A.** He wanted me to change the last of the

(22) answer.

(23) **Q.** He wanted you to change what?

(24) **A.** The – at the end, where it says "Note,

## Page 75

(1) this report submitted within 24 hours," I had put

(2) something else, and he wanted me to change it.

(3) **Q.** Whose handwriting is that?

(4) **A.** That's mine.

(5) **Q.** So if I'm reading it correctly, why

(6) don't you read it for me, in terms of, this is at

(7) the bottom of page 2 just above Mr. Steed's

(8) signature; is that right?

(9) **A.** Yes.

(10) **Q.** What did you write?

(11) **A.** Originally?

(12) **Q.** No. What did you write on this form?

(13) **A.** "Discomfort became progressive. It

(14) intensified as months went by."

(15) **Q.** Is that accurate?

(16) **A.** That's what he wanted me to write.

(17) **Q.** Okay. Is it accurate?

(18) **A.** Yes.

(19) **Q.** Did he tell you why he wanted you to

(20) write that?

(21) **A.** He wanted me to change what I had written

(22) before that one.

(23) **Q.** And what had you written – you had

(24) filled out another form?

## Page 76

(1) **A.** Yes.

(2) **Q.** And what had you written before?

(3) **MS. JONES:** Can I give her the

(4) other form to review?

(5) **MS. LEVERING:** Sure.

(6) **THE WITNESS:** Do you want me to

(7) read it?

(8) **MS. LEVERING:** Why don't I see

(9) what you are looking at. Thank you.

(10) Off the record.

(11) (Discussion off the record)

(12) **MS. LEVERING:** Let's mark this

(13) as Defendant's Exhibit 2, which is an

(14) Employee's Report of Industrial Accident,

(15) that bears Ms. Carper's signature, dated

(16) July 30, 2002.

(17) (Whereupon D-2 was marked for

(18) identification.)

(19) **BY MS. LEVERING:**

(20) **Q.** Ms. Carper, why don't you identify

(21) what's been marked as Defendant's Exhibit 2 for us?

(22) What is it?

(23) **A.** Employee's report, accident report.

(24) **Q.** Looking at Defendant's Exhibit 1,

Page 77

(1) which also bears the same date of July 30, 2002,
(2) which was the first version of this that you
(3) completed?
(4)   **A.**   Your second, Exhibit 2.
(5)   **Q.**   So the first version was Defendant's
(6) Exhibit 2, and after you completed Defendant's
(7) Exhibit 2, you took it to Mr. Steed?
(8)   **A.**   Yes.
(9)   **Q.**   And on Defendant's Exhibit 2, what was
(10) written above the area that asked for the signature
(11) of the reviewer? What did you write?
(12)   **A.**   "Date of accident my supervisor was
(13) notified by myself."
(14)   **Q.**   So you brought that document that
(15) we've marked as Defendant's 2 to Mr. Steed, and did
(16) he review what you had filled out in your presence?
(17) I mean, did you stay with him as he read it through?
(18)   **A.**   Yes.
(19)   **Q.**   And other than, as you say, suggesting
(20) that you change the language, words that are above
(21) the place for Mr. Steed's signature, did he suggest
(22) you make any other changes to the document?
(23)   **A.**   No.
(24)   **Q.**   Now, did he tell you why you should

Page 78

(1) change what you had originally written?
(2)   **A.**   No, he didn't say why.
(3)   **Q.**   Did you ask him why?
(4)   **A.**   No.
(5)   **Q.**   And we've agreed that what is written
(6) on Defendant's Exhibit 1, in terms of "discomfort
(7) became progressive and it intensified as months went
(8) by," is accurate, correct?
(9)   **A.**   Correct.
(10)   **Q.**   Are you suggesting that there was
(11) anything wrong with Mr. Steed, as you say it,
(12) suggesting that you write "discomfort became
(13) progressive and it intensified as months went by"?
(14)   **A.**   Do I disagree?
(15)   **Q.**   Well, you don't disagree; we know it's
(16) accurate.
(17)   **A.**   Right.
(18)   **Q.**   I'm just asking, are you contending
(19) there was something wrong in Mr. Steed asking you to
(20) put that accurate information on the document?
(21)   **A.**   No.
(22)   **Q.**   So are we in agreement, then, that
(23) Defendant's Exhibit 1, which bears the language that
(24) says "discomfort became progressive and it

Page 79

(1) intensified as the months went by," is the accurate
(2) description of what occurred?
(3)   **MS. JONES:**   I'm going to object
(4) to the form of the question.
(5)   **MS. LEVERING:**   That's fair. Let
(6) me rephrase it.
(7)   **BY MS. LEVERING:**
(8)   **Q.**   Is it fair that Defendant's 1 is the
(9) report of industrial accident that was submitted in
(10) connection with your hurting your back, as you say,
(11) on March 15, 2002? This is the official one that
(12) was submitted; is that right?
(13)   **A.**   Yes.
(14)   **Q.**   Did you bring to anyone's attention,
(15) when you submitted Defendant's Exhibit 1 in
(16) connection with the accident you say happened on
(17) March 15th, did you bring to anyone's attention
(18) that there had been an earlier version of the
(19) document?
(20)   **A.**   Just my roommate.
(21)   **Q.**   Mr. Rivera?
(22)   **A.**   Yes.
(23)   **Q.**   And what did you tell Mr. Rivera?
(24)   **A.**   That I had to change my accident report,

Page 80

(1) because it was way after, my report, handing it to
(2) them.
(3)   **Q.**   I'm sorry. Say again.
(4)   **A.**   It was that I had to change it, because
(5) you are supposed to submit it 24 hours after you
(6) report an accident, and it was months later. So I
(7) told him, I believe, that that's why he wanted me to
(8) change my answer to what he put down, what I put
(9) down the second time.
(10)   **Q.**   But you never asked Mr. Steed that,
(11) and that was never discussed between you and
(12) Mr. Steed, correct?
(13)   **A.**   Right.
(14)   **Q.**   And on the document that was submitted
(15) in connection with your report, the date that you
(16) signed the report, July 30th of 2002, was that the
(17) date that the document was actually prepared?
(18)   **A.**   Yes.
(19)   **Q.**   And the date that Mr. Steed signed it,
(20) you also see July 30th of 2002?
(21)   **A.**   Yes.
(22)   **Q.**   And was that the accurate date on
(23) which you submitted it to him?
(24)   **A.**   Yes.

**Page 81**

(1)  **Q.**   Now, the incident, you say, happened
(2)  on March 15th of 2002, and when did you first seek
(3)  any medical attention concerning your back?
(4)  **A.**   May of 2002.
(5)  **Q.**   So not until May of 2002 did you seek
(6)  any kind of medical attention?
(7)  **A.**   Right.
(8)  **Q.**   And from whom did you seek medical
(9)  attention?
(10)  **A.**   My family doctor, Dr. Dear.
(11)  **Q.**   Is that Nancy Dear?
(12)  **A.**   Yes.
(13)  **Q.**   And when you went to Dr. Dear, did you
(14)  see her?
(15)  **A.**   Yes.
(16)  **Q.**   And what did you tell her?
(17)  **A.**   Exactly what had happened at work. And it
(18)  was still, the pain was still there.
(19)  **Q.**   Was anyone else with Dr. Dear when you
(20)  and she talked about why you had come to her?
(21)  **A.**   No.
(22)  **Q.**   And had she been your family doctor
(23)  for some period of time?
(24)  **A.**   Yes.

**Page 82**

(1)  **Q.**   For how long have you used Dr. Dear's
(2)  medical services?
(3)  **A.**   I'll say about 10 years.
(4)  **Q.**   Why didn't you call her or attempt to
(5)  see her before May of 2002?
(6)  **A.**   I thought it was going to go away, just
(7)  like a spasm.
(8)  **MS. LEVERING:**   I'm going to ask
(9)  the reporter to mark as Defendant's 3 a
(10)  document that we obtained through subpoena
(11)  from Dr. Dear, that bears a date of
(12)  May 20, 2002.
(13)      (Whereupon D-3 was marked for
(14)  identification.)
(15)      (Short recess taken at
(16)  12:10 p.m.)
(17)      (Proceedings resumed at
(18)  12:18 p.m.)
(19)  **BY MS. LEVERING:**
(20)      I'm going to show you a complaint that
(21)  was filed in this lawsuit, and I want to direct your
(22)  attention to Paragraph 12, if I could.
(23)  Specifically, I want to address Paragraph 12, the
(24)  third sentence, which says, "Her supervisor changed

**Page 83**

(1)  the information in the report to cover up the fact
(2)  that he had failed to prepare a timely report in
(3)  March of 2002." Do you see that?
(4)  **A.**   Yes.
(5)  **Q.**   The supervisor that you are speaking
(6)  of is Mr. Steed?
(7)  **A.**   Yes.
(8)  **Q.**   And the changed information in the
(9)  report that you are referring to is − there are
(10)  various documents that have been marked; is it any
(11)  of those?
(12)  **A.**   Yes.
(13)  **Q.**   Which one is it?
(14)  **A.**   That was changed is in number one.
(15)  **Q.**   And why do you say, since you never
(16)  talked with Mr. Steed about why he has suggested,
(17)  according to you, that the change in the document be
(18)  made, why do you suggest that he did that to cover
(19)  up something?
(20)  **A.**   I don't know.
(21)  **Q.**   We are in agreement that Mr. Steed's
(22)  date, in terms of he dated his signature on the
(23)  document accurately, as did you, of July 30th,
(24)  2002, correct?

**Page 84**

(1)  **A.**   Yes.
(2)  **Q.**   Is there anything as you sit here that
(3)  can tell me on what basis you would use the words
(4)  "cover up" in your complaint?
(5)  **A.**   That I submitted this months after I
(6)  reported it to him, and human resources didn't know
(7)  anything about the incident until I called them.
(8)  **Q.**   Why are you saying that he attempted
(9)  to cover that up? Are you suggesting that that
(10)  wasn't known?
(11)  **A.**   No, it wasn't known.
(12)  **Q.**   Any other answer to why you would use
(13)  that language in your complaint concerning cover
(14)  up?
(15)  **A.**   No.
(16)  **Q.**   Did you ever ask Mr. Steed to submit a
(17)  report of industrial accident concerning what you
(18)  say happened on March 15th of 2002?
(19)  **A.**   Did I ask him?
(20)  **Q.**   Yes. We spent a long time going
(21)  through a lot of different conversations that you
(22)  had with Mr. Steed, and at no time did you ever make
(23)  any such suggestion?
(24)  **A.**   No, not until human resources said
(25)  something.

Page 85

(1)  Q.  So that was not until July of 2002
(2)  when you spoke with Mr. Knepper, correct?
(3)  A.  Right.
(4)  Q.  And you relayed Mr. Knepper's request
(5)  that Mr. Steed call him, and then Mr. Steed reviewed
(6)  the paperwork that you had prepared, and ultimately
(7)  he signed the industrial accident report, correct?
(8)  A.  Right.
(9)  Q.  So with that history, and, again, I
(10)  don't want to beat a dead horse on this, but with
(11)  that history, I do ask you, in terms of, what are
(12)  you suggesting when you used the words "cover
up"?
(13)  A.  That I guess –
(14)  Q.  Don't guess.
(15)  A.  Well, since he wanted me to change to
(16)  discomfort become progressively and intensified, and
(17)  months later, from March to July, that would mean
(18)  that I was still having issues with my back, and we
(19)  filled out this report.
(20)  Q.  But that's all true, isn't it?
(21)  A.  Yes.
(22)  Q.  So what, if anything, is there in the
(23)  submitted report that's a cover-up or untrue?
(24)  A.  Nothing.

Page 86

(1)  Q.  Upon reflection, can we agree that the
(2)  words "cover up" in your complaint were ill-chosen?
(3)  A.  Could have been.
(4)  Q.  Can we agree that they were?
(5)  A.  Yes.
(6)  Q.  Now, you also in that same paragraph,
(7)  Paragraph 12, on the top of page 4 of your
(8)  complaint, you also write, "Additionally, her
(9)  supervisor falsified time records to cover up the
(10)  fact that Carper missed time due to the injury."
(11)  Do you see that?
(12)  A.  Yes.
(13)  Q.  Who is the supervisor?
(14)  A.  Keith Steed.
(15)  Q.  What do you say he did?
(16)  A.  That the time sheet and my paper stubs
(17)  weren't matching with the dates and stuff that I was
(18)  off work.
(19)  Q.  Who completes the time sheet?
(20)  A.  I fill it out; he signs it.
(21)  Q.  What time sheet or sheets are you
(22)  referring to?
(23)  A.  Regular time sheets we fill out weekly.
(24)  Q.  What period?

Page 87

(1)  A.  I don't understand.
(2)  Q.  What I'm asking you is, you fill it
(3)  out weekly. Are you saying that there was an
(4)  inaccuracy in your time sheets for 1 week? Two
(5)  weeks? Ten weeks? Twenty weeks? What are we
(6)  talking about?
(7)  A.  Each time the time sheets, I guess, were
(8)  different. I don't recall how long.
(9)  Q.  We can agree that in terms of in
(10)  connection with the time sheets, you initially
(11)  filled them out, correct?
(12)  A.  Yes.
(13)  Q.  And then you bring them to Mr. Steed
(14)  as your supervisor, and he has to sign off on them,
(15)  correct?
(16)  A.  Yes.
(17)  Q.  Was there ever a time that you are
(18)  suggesting that Mr. Steed changed the content of
(19)  what you had recorded on your time sheet?
(20)  A.  No.
(21)  Q.  So what did he falsify? Nothing,
(22)  isn't that right?
(23)  A.  There was an absentee report that he fills
(24)  out.

Page 88

(1)  Q.  Did he falsify any time records?
(2)  A.  Not –
(3)  Q.  Did you sign them in the way that you
(4)  had filled them out?
(5)  A.  Yes.
(6)  Q.  Can we agree that he didn't falsify
(7)  any of the time records that you presented to him
(8)  for approval; is that correct?
(9)  A.  Correct.
(10)  Q.  You made mention of an absentee form?
(11)  A.  Yes.
(12)  Q.  What is that?
(13)  A.  They're supposed to log when the
(14)  employee's in, out, absent, vacation, et cetera.
(15)  Q.  And who in the first instance records
(16)  this information?
(17)  A.  Keith does.
(18)  Q.  And where, to your understanding, does
(19)  he get the information from?
(20)  A.  From the employee, if they take a day off.
(21)  Q.  So is there any connection between the
(22)  time sheet and the absentee form? In other words,
(23)  what I'm asking is, on the time sheet, if you happen
(24)  to be out, let's say you worked a Monday through

## Page 97

(1) **Q.** So what occasioned your talking to him
(2) in October or November of 2002? I mean, why were
(3) you talking to him? What sparked you to go see him?
(4) **A.** He called me into his office.
(5) **Q.** So he calls you into his office and
(6) tells you you need to watch your days, right?
(7) **A.** Right.
(8) **Q.** And anything else he said to you?
(9) **A.** My days and my time coming in, getting
(10) there on time.
(11) **Q.** And what did you say to him, if
(12) anything?
(13) **A.** I just said, "Okay," and – I said, "Okay,
(14) I'll try to get in on time."
(15) **Q.** How did this, how did this document,
(16) this 2002 absentee calendar, how did that get
(17) provided to you during the course of the meeting?
(18) Is this something that you would get
(19) for every year that you worked there? Is this a
(20) typical thing?
(21) **A.** No. I asked for it.
(22) **Q.** So you asked him in that meeting for
(23) it?
(24) **A.** Yes.

## Page 98

(1) **Q.** And he gave it to you in that meeting?
(2) **A.** Made a copy, yes.
(3) **Q.** And why did you ask for it?
(4) **A.** So I could see how many days I did take
(5) off – yes, so I could see how many days I did take
(6) off.
(7) **Q.** After he gave it to you, was there any
(8) further exchange, any other words exchanged between
(9) the two of you that you can recall?
(10) **A.** No.
(11) **Q.** And no discussion about the document
(12) at that time, right?
(13) **A.** Right.
(14) **Q.** And so meeting over, and then at some
(15) time you do some research concerning the accuracy of
(16) what's recorded on Defendant's 4; is that right?
(17) **A.** Right.
(18) **Q.** And tell me what you did and what you
(19) looked at and what conclusions you made. That's
(20) three questions. I will object to the form of my
(21) own question.
(22) **MS. JONES:** Thank you.
(23) **MS. LEVERING:** So we will do it
(24) in sequence.

## Page 99

(1) **BY MS. LEVERING:**
(2) **Q.** Tell me, you've got this document in
(3) hand, Ms. Carper?
(4) **A.** Right.
(5) **Q.** What did you do with it?
(6) **A.** I compared it to my pay stubs, to find out
(7) where exactly all my time went, just in, just to
(8) verify to make sure everything matched up with my
(9) time, because I thought I had more time.
(10) **Q.** You thought you had more time
(11) available to you?
(12) **A.** Right.
(13) **Q.** Other than looking at your pay stubs,
(14) any other documents that you looked at?
(15) **A.** No, just the pay stub.
(16) **Q.** Anyone that you talked with in an
(17) effort to kind of research the issue?
(18) **A.** No.
(19) **Q.** And you drew some conclusions as a
(20) result of your study?
(21) **A.** Yes.
(22) **Q.** And what conclusions did you draw?
(23) **A.** That I had more time than what was written
(24) on the absentee calendar.

## Page 100

(1) **Q.** And do you recall the specific
(2) conclusion in terms of how much more time?
(3) **A.** Probably, what, 2 or 3 days more that I
(4) came up with. Could have been wrong.
(5) **Q.** You could have been wrong?
(6) **A.** I could have been, but it wasn't matching
(7) up with what was put down on the pay stub.
(8) **Q.** And once you came to that conclusion,
(9) did you talk to anyone about your conclusion?
(10) **A.** Nobody at work, no.
(11) **Q.** You didn't go back to Mr. Steed and
(12) say, look, I looked at my pay stubs, and I compared
(13) it to this document you gave me? You didn't have
(14) that dialogue with him?
(15) **A.** No.
(16) **Q.** Did you call anyone from payroll?
(17) **A.** I don't think so.
(18) **Q.** Anyone from human resources?
(19) **A.** No.
(20) **Q.** Anyone else within the company?
(21) **A.** No.
(22) **Q.** Is it fair for me to conclude, that
(23) since you didn't take those steps, you weren't sure
(24) whether there actually was a discrepancy between

Page 101

(1) Defendant's Exhibit 4 and your pay stubs?
(2) **A.** Right.
(3) **Q.** You weren't confident in your
(4) conclusion; is that right?
(5) **A.** Right.
(6) **Q.** So, again, looking at Paragraph 12 of
(7) your complaint, can we agree that based on all that
(8) you've just testified to under oath, that the word
(9) "falsified" as you attribute it to Mr. Steed in that
(10) paragraph was, again, ill-chosen?
(11) **A.** Right.
(12) **Q.** He didn't falsify anything, did he?
(13) **A.** No.
(14) **Q.** Other than the pay stubs and the
(15) document that we've marked as Defendant's Exhibit 4,
(16) are there any other records that you are intending
(17) to refer to in Paragraph 12 of the complaint? I'm
(18) focusing on the last sentence that's on the top of
(19) page 4.
(20) **A.** No.
(21) **Q.** All right. You have before you
(22) Defendant's Exhibit 3, which is a document that we
(23) obtained from Dr. Dear's office, and we can agree
(24) that you, in terms of looking at this you indicated

Page 102

(1) that you first saw her for the back pain in May of
(2) 2002.
(3) Looking at this document, which
(4) bears a date of May 20, 2002, does that refresh your
(5) memory of when you first saw her?
(6) **A.** Yes.
(7) **Q.** Do you see, in terms of in the top
(8) half of the document, in terms of where she records
(9) the complaints that you kind of made to her in terms
(10) of what you were coming to her to see, it refers to
(11) back pain?
(12) **A.** Yes.
(13) **Q.** And at that time you were 40 years old
(14) or thereabouts?
(15) **A.** Yes, give or take.
(16) **Q.** And that you were complaining of
(17) approximately 3 months of lower back pain?
(18) **A.** Yes.
(19) **Q.** And you had told her that it probably
(20) started, and I think there is a word that didn't
(21) copy off, it started in mid March at work. Do you
(22) see that?
(23) **A.** Yes.
(24) **Q.** Is that what you told her?

Page 103

(1) **A.** Yes.
(2) **Q.** And then at the bottom of the page,
(3) there's a line that reads "OOW 2D," and then C with
(4) a line drawn above it, light duty 10D. Do you know
(5) what that means?
(6) **A.** No, I don't know what that means, but she
(7) just put me on light duty for 10 pounds, lift no
(8) more than 10.
(9) **MS. LEVERING:** Let me show you
(10) another document that we will mark. Off
(11) the record.
(12) (Discussion off the record.)
(13) **MS. LEVERING:** I'm going to ask
(14) the reporter, if he'd be good enough, to
(15) mark a note that we obtained from Dr. Dear
(16) in her records concerning Ms. Carper that
(17) bears a date of 4/20/2002, and it's signed
(18) by Dr. Dear.
(19) (Whereupon D-5 was marked for
(20) identification.)
(21) **BY MS. LEVERING:**
(22) **Q.** Ms. Carper, you are looking at, again,
(23) another document that Dr. Dear provided to us under
(24) subpoena and with your consent, and it bears a date

Page 104

(1) of May 20, 2002, the day that you first saw her. Do
(2) you see that?
(3) **A.** Yes.
(4) **Q.** Is this the note she gave you on that
(5) date as you left her office?
(6) **A.** Yes.
(7) **Q.** So it says, "Out of work May 20 and
(8) May 21," correct?
(9) **A.** Yes.
(10) **Q.** And then it says light duty from
(11) May 23 dash May 31; do you see that?
(12) **A.** Yes.
(13) **Q.** No bending, no lifting more than
(14) 5 pounds; do you see that?
(15) **A.** Yes.
(16) **Q.** Now, what did you do with this
(17) document, if anything?
(18) **A.** I called Keith, told him about the being
(19) off, and then I brought it into work when I came in
(20) the 23rd.
(21) **Q.** So you gave it to him on the 23rd
(22) when you came back?
(23) **A.** Yes.
(24) **Q.** And was there any discussion between

## Page 105

(1) the two of you at that time?

(2) **A.** No.

(3) **Q.** Did you have any discussion with

(4) anyone other than Mr. Steed concerning the content

(5) of the document?

(6) **A.** No.

(7) **Q.** From May 23 to May 31, did Mr. Steed

(8) and VWR abide by the restrictions that the doctor

(9) listed?

(10) **A.** At that time, yes.

(11) **Q.** Was there ever a time when Mr. Steed

(12) failed to abide by any restrictions that you made

(13) him aware of that had been instructed by your

(14) doctor?

(15) **A.** No.

(16) **Q.** In your answers to interrogatories,

(17) you listed a number of doctors, and one of them was

(18) Dr. Dominic Diorio?

(19) **A.** Yes.

(20) **Q.** Do you remember him?

(21) **A.** Yes.

(22) **Q.** What did you see him for?

(23) **A.** I had a back spasm at the emergency room,

(24) Christian.

## Page 106

(1) **MS. LEVERING:** I'm going to ask

(2) the reporter to mark as Defendant's 6,

(3) again, another document obtained through

(4) subpoena from Dr. Diorio concerning

(5) Ms. Carper.

(6) (Whereupon D-6 was marked for

(7) identification.)

(8) **BY MS. LEVERING:**

(9) **Q.** Ms. Carper, you have before you a

(10) document that Dr. Diorio provided to us pursuant to

(11) subpoena, and this concerns the back spasm, as you

(12) say, that you went to the emergency room at South

(13) Jersey to seek treatment for?

(14) **A.** Yes.

(15) **Q.** And you went there on May 30th of

(16) 2002?

(17) **A.** Yes.

(18) **Q.** And you were discharged from the

(19) hospital, from the emergency room, I should say, on

(20) that same day, correct?

(21) **A.** Correct.

(22) **Q.** And the return-to-work instructions

(23) indicate that you can go back to work in 2 days

(24) without restrictions; there are no limitations,

## Page 107

(1) correct?

(2) **A.** Right.

(3) **Q.** And did you do that?

(4) **A.** Yes.

(5) **Q.** Now, what happened after you returned

(6) to work in June, after you had been attended to at

(7) the emergency room, the 2 days had passed, and you

(8) went back to work without restriction. What

(9) happened at work at that point?

(10) **A.** In June?

(11) **Q.** Yes. Did you go back to work, first

(12) of all?

(13) **A.** Yes. I did my shipping as best as I could

(14) with light-duty restriction.

(15) **Q.** Were there any restrictions in place

(16) at that time?

(17) **A.** I take that back. No, there wasn't.

(18) **Q.** But is it fair to say that you still

(19) were on light duty?

(20) **A.** Yes.

(21) **Q.** And how long did that situation

(22) continue?

(23) **A.** Until August.

(24) **Q.** So is it fair for me to understand,

## Page 108

(1) even though there were no restrictions from your

(2) doctors that you'd be on light duty, that VWR

(3) continued to have you on light duty from June of

(4) 2002, until some time in August of 2002?

(5) **A.** Yes.

(6) **Q.** And what did your light duty consist

(7) of?

(8) **A.** Shipping the light boxes.

(9) **Q.** And by the light boxes, what poundage

(10) are we speaking of?

(11) **A.** No more than 10 pounds.

(12) **Q.** And what would happen with the other

(13) boxes?

(14) **A.** Keith would do the other boxes.

(15) **Q.** Any other restrictions, that even

(16) though they weren't coming from doctors, any other

(17) restrictions that you worked under in connection

(18) with light duty from June through some time in

(19) August of 2002?

(20) **A.** No.

(21) **Q.** So, again, going back to your

(22) description of the job, you could lift light boxes,

(23) correct?

(24) **A.** Correct.

## Page 109

(1) **Q.** And could you do the occasional
(2) climbing that you described for me?
(3) **A.** Yes.
(4) **Q.** Yes?
(5) **A.** Yes.
(6) **Q.** Could you do the kneeling and the
(7) squating that you described for me?
(8) **A.** With difficulty.
(9) **Q.** Did you do it?
(10) **A.** Yes.
(11) **Q.** Could you bend?
(12) **A.** Yes.
(13) **Q.** And did you do that consistently?
(14) **A.** Yes.
(15) **Q.** Other than the poundage, were there
(16) any other things that you kind of sought assistance
(17) for during that period from June through some time
(18) in August of '02?
(19) **A.** No.
(20) **Q.** And then what happened in August?
(21) **A.** My doctor put me out, put me out of work.
(22) **Q.** Which doctor?
(23) **A.** Dr. Dear.
(24) **Q.** Did she examine you?

## Page 110

(1) **A.** Yes.
(2) **Q.** Did you ever request that she, as you
(3) call it, put you out from work?
(4) **A.** No, I didn't request it.
(5) **Q.** You didn't request it? And when do
(6) you recall that you stopped working?
(7) **A.** Mid-August, I believe.
(8) **MS. LEVERING:** Let me ask the
(9) reporter to mark as Defendant's 7 a
(10) document obtained, again, under subpoena
(11) from Dr. Dear concerning Ms. Carper.
(12) (Whereupon D-7 was marked for
(13) identification.)
(14) **BY MS. LEVERING:**
(15) **Q.** Ms. Carper, you have before you what
(16) we've marked as Defendant's Exhibit 7.
(17) Looking at this document, does
(18) this refresh your recollection that you were out of
(19) work from August 19, beginning on August 19, 2002?
(20) **A.** From August to September, yes.
(21) **Q.** And that according to this, you were
(22) scheduled to return to work on September the 9th of
(23) 2002?
(24) **A.** Yes.

## Page 111

(1) **Q.** When did you obtain this certificate
(2) from Dr. Dear?
(3) **A.** August 19th.
(4) **Q.** Well, I ask because there is no record
(5) of your having seen her on August the 19th. Do
(6) you recall how you came to get this document from
(7) her?
(8) **A.** No. I must have picked it up at her
(9) office.
(10) **Q.** Do you recall when in relation to
(11) August 19th you last saw Dr. Dear?
(12) **A.** No.
(13) **MS. LEVERING:** Why don't we
(14) break for lunch and then come back.
(15) (Luncheon recess taken at
(16) 1:07 p.m.)
(17) (Proceedings resumed at
(18) 2:02 p.m.)
(19) **BY MS. LEVERING:**
(20) **Q.** Ms. Carper, the same instructions that
(21) we talked about this morning in terms of, if you
(22) don't understand what I'm saying, you know, let me
(23) know. I think we've done a pretty good job of it
(24) together this morning, so we will keep up that same

## Page 112

(1) routine.
(2) **A.** Okay.
(3) **Q.** I remind you that you continue to be
(4) under oath.
(5) **A.** Okay.
(6) **Q.** We were talking right before the lunch
(7) break about Defendant's Exhibit 7, which is the
(8) doctor's note, and I want to just return to that, if
(9) I could. Do you have that in front of you?
(10) **A.** Yes.
(11) **Q.** Great. And we had ended in terms of,
(12) that you recall that you had stopped by the office
(13) of Dr. Dear and picked up the note, and the pending
(14) question that I had to you was, do you recall when
(15) you saw her in relation to the issuance of the note?
(16) **A.** No, I don't.
(17) **Q.** We can agree, though, that on the date
(18) that it was issued, she didn't examine you on that
(19) day, did she?
(20) **A.** I don't believe so, no.
(21) **Q.** Now, can we also agree that the
(22) signature on Defendant's Exhibit 7, do you know
(23) whose signature that is in terms of it's not
(24) Dr. Dear's writing, correct?

## Page 113

(1)    **A.**    Correct.

(2)    **Q.**    Do you know who signed it?

(3)    **A.**    Probably one of the nurses.

(4)    **Q.**    Someone in her office signed it?

(5)    **A.**    Yes.

(6)    **MS. LEVERING:**    Fair enough.

(7)    Let's mark as Defendant's Exhibit 8

(8)    another document that we obtained from

(9)    Dr. Dear, that has in the upper portion of

(10)    the document a telephone record of

(11)    conversation between Ms. Carper and

(12)    Dr. Dear's office, and then on the bottom

(13)    half of the page is what has been

(14)    separately marked as Defendant's Exhibit

(15)    7.

(16)    (Whereupon D-8 was marked for

(17)    identification.)

(18)    **BY MS. LEVERING:**

(19)    **Q.**    Again, I will represent to you this is

(20)    a document obtained from Dr. Dear under subpoena.
I

(21)    had asked you before whether you had called to

(22)    solicit the doctor's note, and you said that you had

(23)    not done that.

(24)    In terms of looking at what

## Page 114

(1)    we've marked as Defendant's Exhibit 8, the document

(2)    in the upper left hand corner, you see that it bears

(3)    a date of 8/15/02 at 9:15 in the morning?

(4)    **A.**    Yes.

(5)    **Q.**    And does this refresh your memory that

(6)    you placed a phone call to Dr. Dear's office that

(7)    morning?

(8)    **A.**    Yes.

(9)    **Q.**    Does it, looking at the message part,

(10)    does it also refresh your recollection that you

(11)    asked that there be a note stating that your back

(12)    hurts in work and that you'd like to be out for 3

(13)    weeks?

(14)    Does that refresh your memory of

(15)    what you requested from the doctor's office?

(16)    **A.**    Yes.

(17)    **Q.**    And is it fair, in terms of, as you

(18)    reflect back on this, that you received a response

(19)    back from the doctor's office, and that is also

(20)    recorded here? Do you see that?

(21)    **A.**    Yes.

(22)    **Q.**    And that you received that phone call

(23)    back, it looks to be on August the 16th; is that

(24)    consistent with your memory?

## Page 115

(1)    **A.**    Yes.

(2)    **Q.**    And that the doctor had indicated

(3)    okay, and that a note would be given for 3 weeks

(4)    out; do you see that?

(5)    **A.**    Yes.

(6)    **Q.**    And the note that is given is the note

(7)    that appears on the bottom half of the document; is

(8)    that right?

(9)    **A.**    Right.

(10)    **Q.**    Okay. So you were then out from

(11)    August 19th of 2002, until or through

(12)    September 6th of 2002, with a scheduled return on

(13)    September 9 of 2002, correct?

(14)    **A.**    Correct.

(15)    **Q.**    Did you return to work that day?

(16)    **A.**    Yes.

(17)    **Q.**    Prior to your return to work, did you

(18)    see Dr. Dear again?

(19)    **A.**    I don't remember, I don't remember.

(20)    **Q.**    Let me ask the reporter to mark as

(21)    Defendant's Exhibit 9 another document obtained

(22)    under subpoena from Dr. Dear's office that bears a

(23)    date of 9/3/02.

(24)    (Whereupon D-9 was marked for

## Page 116

(1)    identification.)

(2)    **BY MS. LEVERING:**

(3)    **Q.**    Now, looking at what's been marked as

(4)    Defendant's Exhibit 9, do you see once again it

(5)    indicates that you placed a phone call to Dr. Dear's

(6)    office on 9/3/02?

(7)    **A.**    Yes.

(8)    **Q.**    And it also records the message that

(9)    you intended to relay to the doctor, correct?

(10)    **A.**    Correct.

(11)    **Q.**    And you had asked that you wanted to

(12)    be out of work until the end of the month, that's

(13)    the month of September; is that correct?

(14)    **A.**    Correct.

(15)    **Q.**    And you asked that if the doctor would

(16)    write you a note, correct?

(17)    **A.**    Correct.

(18)    **Q.**    And then you received a response from

(19)    the doctor, correct?

(20)    **A.**    Correct.

(21)    **Q.**    And do you recall that Dr. Dear

(22)    indicated that she would give you a note until

(23)    September 15 only, and that you were to see a back

(24)    specialist at that time?

Page 117

(1)  **A.**  Right.

(2)  **Q.**  Now, does that refresh your memory
(3)  that you did not return to work on September 9 of
(4)  2002?

(5)  **A.**  I guess I didn't go back to work.

(6)  **Q.**  Excuse me?

(7)  **A.**  I thought I did, but no, I guess I didn't
(8)  go back on the 9th.

(9)  **MS. LEVERING:**  Let me show you
(10)  another document and that may help you.
(11)  I'm going to ask the reporter to
(12)  mark as Defendant's Exhibit 10 another
(13)  document obtained from Dr. Dear's office
(14)  concerning Ms. Carper.
(15)  (Whereupon D-10 was marked for
(16)  identification.)

(17)  **BY MS. LEVERING:**

(18)  **Q.**  Ms. Carper, you have before you what
(19)  we've marked as Defendant's 10, which is a document
(20)  obtained pursuant to subpoena on Dr. Dear, and
(21)  indicates that you were to return to work on
(22)  September 15 of 2002. Do you see that?

(23)  **A.**  Yes.

(24)  **Q.**  Does that refresh your memory that you

Page 118

(1)  did not return to work on September 9 of '02?

(2)  **A.**  No.

(3)  **Q.**  If it doesn't, just say so.

(4)  **A.**  No, it doesn't.

(5)  **Q.**  Okay. Do you have a specific
(6)  recollection of having returned to work on
(7)  September 9 of '02, or you're just not sure?

(8)  **A.**  I'm not sure.

(9)  **Q.**  You had told me earlier that you
(10)  stopped working at the Beech Street location in
(11)  August of '02; do you remember that?

(12)  **A.**  Yes.

(13)  **Q.**  And then in looking back through the
(14)  documents, is it – I think we had gone over this,
(15)  but if not, let me make sure I do go over this with
(16)  you.
(17)  It's my understanding that your
(18)  last day worked at the Beech Street location was
(19)  August 19 of '02 or thereabouts?

(20)  **A.**  Yes.

(21)  **Q.**  So you are not clear if you came back
(22)  to work on September 9 of 2002; is that right?

(23)  **A.**  Right.

(24)  **Q.**  Do you have any memory, however, of

Page 119

(1)  when you next came back to work, what location you
(2)  came back to?

(3)  **A.**  I came back in October. I know I came
(4)  back, I think it was like for a day, and then they
(5)  sent me back home.

(6)  **Q.**  When you say you came back, you came
(7)  back to where?

(8)  **A.**  To Beech Street.

(9)  **Q.**  And you remember that that occurred
(10)  some time in October?

(11)  **A.**  Yes.

(12)  **Q.**  Prior to October, again, we're
(13)  struggling with September here, but prior to
(14)  October, do you recall returning to the Beech Street
(15)  location?

(16)  **A.**  No. No.

(17)  **Q.**  What did you do with the doctor's note
(18)  that was marked as Defendant's Exhibit 7, the one
(19)  that had you returning to work on September 9; do
(20)  you recall?

(21)  **A.**  I gave it to Keith.

(22)  **Q.**  Do you recall when?

(23)  **A.**  Might have been the 20th or the 21st of
(24)  August.

Page 120

(1)  **Q.**  The 20th or 21st of August?

(2)  **A.**  I think so.

(3)  **Q.**  Do you recall that you went to the
(4)  Beech Street location to present the doctor's note
(5)  to him in person?

(6)  **A.**  Yes.

(7)  **Q.**  And was he there and were you able to
(8)  present the note to him in person?

(9)  **A.**  Yes.

(10)  **Q.**  And when you did, was there any
(11)  discussion between the two of you at that time that
(12)  you can recall?

(13)  **A.**  No, just – you know, he just said get
(14)  better, come back to work as fast as I can.

(15)  **Q.**  How about in terms of the note that
(16)  we've marked as Defendant's Exhibit 10, the one that
(17)  indicates a return-to-work on September the 15th
(18)  of '02, what did you do with that after you obtained
(19)  that from Dr. Dear's office?

(20)  **A.**  I don't remember.

(21)  **Q.**  Do you remember providing that to
(22)  Mr. Steed or anyone else at VWR at any time?

(23)  **A.**  Oh, to Keith, yes.

(24)  **Q.**  And so you gave it to Mr. Steed?

## Page 125

(1) October the 18th of 2002?

(2) **A.** Yes.

(3) **Q.** And did you discuss with Dr. Pistilli

(4) your situation at work?

(5) **A.** Yes.

(6) **Q.** What did you tell him?

(7) **A.** How I injured my back and what area it

(8) was, the pain was in.

(9) **Q.** Did he provide you any treatment that

(10) day?

(11) **A.** Yes.

(12) **Q.** And did you see him subsequent to the

(13) 18th of October?

(14) **A.** Yes.

(15) **Q.** Do you still see him, by the way?

(16) **A.** No.

(17) **Q.** When did you stop?

(18) **A.** Twenty-fifth, 25th of October.

(19) **Q.** And why did you stop?

(20) **A.** It wasn't doing any good.

(21) **Q.** Now, did you obtain this note from his

(22) office?

(23) **A.** Yes.

(24) **Q.** And it indicates that you are to be

## Page 126

(1) excused from work from 10/16/02 through 10/25/02,

(2) correct?

(3) **A.** Right.

(4) **Q.** And he gave you this on the 18th of

(5) October when you saw him, correct?

(6) **A.** Yes.

(7) **Q.** What did you do with it?

(8) **A.** Gave it to Keith.

(9) **Q.** Do you recall whether you drove to

(10) Beech Street, or you got it to him by some other

(11) means?

(12) **A.** Took it, drove it to him.

(13) **Q.** I just note that there is a, you see

(14) on the top of the document there's something that

(15) says 10/21/02, and it appears to be a fax number

(16) from something called Sir Speedy; do you see that?

(17) **A.** Yes.

(18) **Q.** Have you used that place of business

(19) to send faxes?

(20) **A.** Did I?

(21) **Q.** I can only ask if you remember, so

(22) either you do or you don't. It would suggest to me

(23) you did.

(24) **A.** I probably did fax it to him.

## Page 127

(1) **Q.** Do you recall any discussion with

(2) Mr. Steed concerning the content of this document?

(3) **A.** No.

(4) **Q.** So this is kind of indicating that you

(5) are going to come back to work on 10/25/02; is that

(6) an accurate reflection? I mean, am I reading that

(7) right?

(8) **A.** Yes.

(9) **Q.** And did you come back at that time?

(10) **A.** That Monday, the 28th.

(11) **MS. LEVERING:** I'm going to ask

(12) the reporter to mark a document that bears

(13) a date of October 25, '02 from

(14) Dr. Pistilli's office concerning

(15) Ms. Carper.

(16) (Whereupon D-13 was marked for

(17) identification.)

(18) **BY MS. LEVERING:**

(19) **Q.** All right, Ms. Carper, you have before

(20) you Defendant's Exhibit 13, and do you recognize

(21) this as a note that you received from Dr. Pistilli's

(22) office on October the 25th of 2002?

(23) **A.** Yes.

(24) **Q.** And this indicated your return to work

## Page 128

(1) on October the 28th of 2002?

(2) **A.** Yes.

(3) **Q.** And what did you do with this

(4) document?

(5) **A.** I gave it to Keith.

(6) **Q.** And do you recall when you did that?

(7) **A.** When we both arrived at work in the

(8) morning.

(9) **Q.** On October the 28th?

(10) **A.** Twenty-eighth, yes.

(11) **Q.** And why don't you tell me what

(12) happened that morning when you gave him the

(13) document? Did you talk with him about it?

(14) **A.** Yes.

(15) **Q.** What was said?

(16) **A.** Discussed the weight requirement.

(17) **Q.** And what was said about that?

(18) **A.** That human resources rejected this weight

(19) requirement from this doctor.

(20) **Q.** Mr. Steed told you that?

(21) **A.** Yes.

(22) **Q.** Did he tell you why?

(23) **A.** He was told from human resources that he's

(24) not a doctor doctor that could write out a

## Page 129

(1) requirement, weight requirement for me.
(2) **Q.** So Mr. Steed was telling you that
(3) human resources found Dr. Pistilli, as a
(4) chiropractor, that his note was not adequate?
(5) **A.** Right.
(6) **Q.** Did Mr. Steed say anything else to
(7) you?
(8) **A.** I think I got sent home that day.
(9) **Q.** So he told you to go home?
(10) **A.** Right.
(11) **Q.** Other than telling you what you say
(12) human resources had told him and telling you to go
(13) home, do you recall his saying anything else to you
(14) that day?
(15) **A.** No.
(16) **Q.** Did you attempt to contact Dr. Dear?
(17) **A.** I think so.
(18) **Q.** When did you attempt to contact
(19) Dr. Dear?
(20) **A.** I believe it was that week.
(21) **Q.** So during the month of – during the
(22) first week in November?
(23) **A.** The last week of October.
(24) **Q.** I'm sorry. Last week of October?

## Page 130

(1) **A.** Yes.
(2) **Q.** And did you succeed in getting in
(3) touch with her?
(4) **A.** I can't remember. I think I did.
(5) **Q.** And did she examine you?
(6) **A.** I think so.
(7) **Q.** I can tell you that in terms of the
(8) records that we've obtained from Dr. Dear, I have
(9) nothing up until a note, which I will show you, that
(10) is November the 8th of 2002. Let me get that so you
(11) have the benefit of that.
(12) **MS. LEVERING:** So let's mark as
(13) Defendant's 14 a note that we obtained
(14) under subpoena from Dr. Dear's office that
(15) concerns Ms. Carper and bears a date of
(16) 11/8/02.
(17) (Whereupon D-14 was marked for
(18) identification.)
(19) **BY MS. LEVERING:**
(20) **Q.** You have that before you?
(21) **A.** Yes.
(22) **Q.** And is that a note that Dr. Dear
(23) provided to you?
(24) **A.** Yes.

## Page 131

(1) **Q.** And it bears a date of 11/8/02?
(2) **A.** Yes.
(3) **Q.** Does that help refresh your memory of
(4) when you first saw Dr. Dear after you say that you
(5) had presented to Mr. Steed the note from
(6) Dr. Pistilli that we marked as Defendant's 13?
(7) **A.** Yes.
(8) **Q.** So that was the date that you saw her
(9) next?
(10) **A.** Correct.
(11) **Q.** When did you schedule the appointment
(12) with her for the 8th; do you have any memory of
(13) that? Was that that morning that you called, or the
(14) day before, or what?
(15) **A.** Might have been a couple of days before.
(16) **Q.** Do I understand that after Mr. Steed
(17) told you to go home on the 28th you didn't call
(18) Dr. Dear that day; is that right?
(19) **A.** Right.
(20) **Q.** So some time passed before you called
(21) her office?
(22) **A.** Correct.
(23) **Q.** When you went to see her on the 8th,
(24) do you have any memory of whether or not you

## Page 132

(1) discussed with her Dr. Pistilli's note that we've
(2) marked as Defendant's 13?
(3) **A.** Yes.
(4) **Q.** Tell me what you recall about that.
(5) **A.** I explained to her that they wouldn't
(6) accept the weight requirement, that, you know, it
(7) would have to come from a doctor, a practitioner, or
(8) whatever you call them.
(9) **Q.** It would have to come from a medical
(10) doctor?
(11) **A.** Right.
(12) **Q.** And then I see that, at least the note
(13) that we've marked as Defendant's 14, which is the
(14) next thing that I have from her file, on November
(15) the 8th when you saw her, it just says "out of work
(16) until 11/15/02," correct?
(17) **A.** Correct.
(18) **Q.** What I'm trying to understand is, why
(19) does the note say that, if you can explain it to me,
(20) you might not be able to, but why does it say that,
(21) rather than her issuing you a note under her
(22) signature with the weight restriction? Do you
(23) understand my question?
(24) **A.** No.

## Page 137

(1)   **Q.**   Did you have a scheduled appointment
(2)  with him?
(3)   **A.**   No.
(4)   **Q.**   Do you have any record that would
(5)  indicate the date that you met with him?
(6)   **A.**   Yes. I had a signed paper for Mutual
(7)  Liberty that I had to re-sign again while I was in
(8)  his office.
(9)   **MS. LEVERING:**   Let's mark as
(10)  Defendant's 15 an Authorization to Obtain
(11)  Information, dated November 4, 2002, that
(12)  appears to bear the signature of
(13)  Ms. Carper.
(14)   (Whereupon D-15 was marked for
(15)  identification.)
(16)   **BY MS. LEVERING:**
(17)   **Q.**   You have before you a document
(18)  entitled Authorization to Obtain Information; do you
(19)  see that?
(20)   **A.**   Yes.
(21)   **Q.**   And this is the document that you
(22)  signed?
(23)   **A.**   Yes.
(24)   **Q.**   And is this the document that you went

## Page 138

(1)  to Mr. Knepper's office to sign?
(2)   **A.**   Yes.
(3)   **Q.**   So the date that you met with him was
(4)  November the 4th of 2002?
(5)   **A.**   Yes.
(6)   **Q.**   Now, did he ask you to stop by?
(7)   **A.**   I'm not sure.
(8)   **Q.**   Was anyone else present when you saw
(9)  Mr. Knepper that day?
(10)   **A.**   No, not in his office, no.
(11)   **Q.**   What was discussed with him that day?
(12)   **A.**   He reexplained the chiropractor's notes
(13)  and why they couldn't accept it.
(14)   **Q.**   What did he say?
(15)   **A.**   That, you know, they weren't real doctors,
(16)  basically, and they couldn't write out requirements,
(17)  weight requirements.
(18)  And he was just explaining that
(19)  Mutual Liberty didn't get my first application for
(20)  this, so I had to re-sign for it again, and
(21)  basically there was no really light duty for the
(22)  warehouse, and I'm required to do my work as a
(23)  shipper, and basically not supposed to really like
(24)  get any help; I'm supposed to, like, do my job.

## Page 139

(1)   **Q.**   Did you ask him any questions?
(2)   **A.**   I don't recall, no.
(3)   **Q.**   Did you have any disagreement with
(4)  what he was telling you?
(5)   **A.**   No.
(6)   **Q.**   Just so we can be clear, let's just
(7)  mark – Ms. Carper, in terms of Liberty Mutual, was
(8)  that in connection with the workers' compensation
(9)  claim that you filed?
(10)   **A.**   Yes.
(11)   **Q.**   And was it explained to you that you
(12)  needed to sign this form that is Defendant's 15 in
(13)  order for them to process your claim?
(14)   **A.**   Yes.
(15)   **MS. LEVERING:**   Now, let's mark
(16)  as Defendant's 16 a letter to Ms. Carper
(17)  dated October 9, 2002 from Liberty Mutual.
(18)   (Whereupon D-16 was marked for
(19)  identification.)
(20)   **BY MS. LEVERING:**
(21)   **Q.**   Ms. Carper, you have before you
(22)  Defendant's 16. Can we agree that that's a letter
(23)  that you received from Liberty Mutual in connection
(24)  with your workers' compensation claim?

## Page 140

(1)   **A.**   Yes.
(2)   **Q.**   Can we also agree that Liberty Mutual
(3)  told you that they couldn't – they denied your
(4)  claim because they didn't have sufficient
(5)  documentation concerning your claim?
(6)   **A.**   Correct.
(7)   **Q.**   And was it your understanding that you
(8)  needed to allow them to obtain the information for
(9)  which you signed the authorization on November 4 of
(10)  2002?
(11)   **A.**   Correct.
(12)   **Q.**   At any time after November 4, when you
(13)  met with Mr. Knepper, did you again perform work for
(14)  VWR?
(15)   **A.**   No.
(16)   **Q.**   And I mean at any location of VWR.
(17)  Did you ever set foot in and do another day's work
(18)  at VWR since November 4 of 2002?
(19)   **A.**   Oh, Chestnut Run, in November.
(20)   **Q.**   How did that come to be? Did they
(21)  call you and ask you to come back?
(22)   **A.**   Yes, they called me and said they had
(23)  light duty for me to do.
(24)   **Q.**   Who called you?

## Page 141

(1) **A.** I don't know if it was Keith or Mike that
(2) called me.
(3) **Q.** That would have been Mike –
(4) **A.** Finocchairo.
(5) **Q.** Finocchairo?
(6) **A.** Yes. I don't remember which one.
(7) **Q.** Could it have been either of them, or
(8) are you pretty clear it was one or the other of
(9) them?
(10) **A.** It was one of the two.
(11) **Q.** And this was over the phone, I trust?
(12) **A.** Yes.
(13) **Q.** What did they say to you?
(14) **A.** That they had some computer inventory that
(15) I could be doing for light duty work.
(16) **Q.** Computer inventory, what's that mean?
(17) **A.** I guess the warehouses were doing
(18) inventory, and they wanted it inputted into their
(19) system.
(20) **Q.** So this isn't something you did as a
(21) shipper. This was some other assignment that they
(22) might have available for you?
(23) **A.** Correct.
(24) **Q.** And did you express any hesitation in

## Page 142

(1) coming back?
(2) **A.** No.
(3) **Q.** And you did come back?
(4) **A.** Yes.
(5) **Q.** And I believe the records reflect that
(6) you came back on this assignment, this computer
(7) inventory assignment on November 13th?
(8) **A.** Correct.
(9) **Q.** And the work location was Chestnut
(10) Run?
(11) **A.** Yes.
(12) **Q.** Was there anyone in particular that
(13) you reported to in connection with this computer
(14) inventory project?
(15) **A.** David Gibson.
(16) **Q.** Had you ever worked with Mr. Gibson
(17) before?
(18) **A.** No.
(19) **Q.** Do you know what his position was?
(20) **A.** No.
(21) **Q.** What were you asked to do?
(22) **A.** Just input the numbers that they had down
(23) on the paper and put it into the computers that he
(24) had.

## Page 143

(1) **Q.** So someone is doing an inventory of
(2) stock?
(3) **A.** Physical inventory, yes.
(4) **Q.** You weren't doing the physical
(5) inventory of the stock; is that right?
(6) **A.** No, right.
(7) **Q.** Someone was filling out some
(8) paperwork?
(9) **A.** Yes.
(10) **Q.** And then the information on that
(11) paperwork, you were doing data entry into a
(12) computer?
(13) **A.** Yes.
(14) **Q.** In connection with that assignment,
(15) were you doing any other task?
(16) **A.** No.
(17) **Q.** And how long did that project last?
(18) **A.** Probably about a month and a half, total.
(19) **Q.** So some time in, what, December, later
(20) part of December, it ended?
(21) **A.** Yes.
(22) **Q.** And so was Mr. Gibson supervising you
(23) in connection with this project?
(24) **A.** No. He would just give me the work and

## Page 144

(1) explain to me just one day, and then that was it.
(2) **Q.** And when it was all done, I mean, who
(3) did you have to say "I'm all done"?
(4) **A.** I'd first try to find him.
(5) **Q.** Okay.
(6) **A.** And just wait for him to get back to me,
(7) whatever else he wanted me to do.
(8) **Q.** And he had told you that the project
(9) was over?
(10) **A.** He didn't say it was over, but there was
(11) nothing else – yes, basically.
(12) **Q.** And then what happened in connection
(13) with your work?
(14) **A.** Then I was eased on out to the warehouse
(15) floor.
(16) **Q.** And this was in Chestnut Run?
(17) **A.** Yes.
(18) **Q.** What job were you doing at that time?
(19) **A.** Started off as a receiver.
(20) **Q.** And this is the, I think you
(21) explained, this is the scanning of –
(22) **A.** Yes.
(23) **Q.** – shipments?
(24) **A.** Yes.

### Page 145

(1) Q.   And other than scanning, were there
(2) any other duties of the receiver job that you were
(3) then doing?
(4) A.   As a receiver, no.
(5) Q.   What do you do as the receiver? I
(6) mean, are you, you know, are you lifting up packages
(7) or something to scan them? How do you do it?
(8) A.   First, she had – well, yes, they're on a
(9) conveyor belt. It comes down on a conveyor belt,
(10) and each person has their own computer, and you just
(11) come down, and you just slide the box next to you,
(12) and you scan it in, and you slide it down the rest
(13) of the way.
(14) Q.   Do you have to do any lifting of any
(15) kind?
(16) A.   You lift a box over to get to another
(17) conveyor belt.
(18) Q.   So there is some lifting in connection
(19) with it?
(20) A.   Yes.
(21) Q.   And what's the weight of the stuff
(22) that you are lifting?
(23) A.   It varies.
(24) Q.   So is it as it was in your shipping

### Page 146

(1) job, up to that, what did you tell me, approximately
(2) 50-pound limit?
(3) A.   Right.
(4) Q.   So that would be the weight of the
(5) things that you conceivably would be lifting as a
(6) receiver?
(7) A.   Yes.
(8) Q.   And you had talked to me before about
(9) bending, and kneeling, and squating. Would you have
(10) those responsibilities? I mean, would you have to
(11) do those physical activities, as well, in connection
(12) with doing the receiver work?
(13) A.   Yes.
(14) Q.   And basically of the same duration
(15) that you explained to me for the shipper's work?
(16) A.   Yes.
(17) Q.   Now, you say that you started as a
(18) receiver. When you were first out on the warehouse
(19) floor at Chestnut Run, who else was working there,
(20) if anyone?
(21) A.   Melissa Houser.
(22) Q.   Do you know what her job was?
(23) A.   She was at that time a shipper. And John,
(24) I can't think of his last name right now.

### Page 147

(1) Q.   What was his job; do you know?
(2) A.   He was a receiver.
(3) Q.   You had told me before –
(4) A.   And there was Hammer and Sonny and
(5) Preston. And Rachel.
(6) Q.   And Rachel Talmo, she was the
(7) supervisor?
(8) A.   Right.
(9) Q.   And Hammer, what was his job; do you
(10) know?
(11) A.   He works for the trucking group, THG.
(12) Q.   THG?
(13) A.   They just delivered. Yes.
(14) Q.   Any idea what that stands for?
(15) A.   No.
(16) MR. STEED:   Can I interject?
(17) MS. LEVERING:   No.
(18) BY MS. LEVERING:
(19) Q.   How about Sonny?
(20) A.   Sonny was – he was VWR, I believe.
(21) Q.   What does that mean, "he was VWR"?
(22) A.   I mean he was an employee with the VWR.
(23) He delivered and picked up items from DuPont on the
(24) DuPont site.

### Page 148

(1) Q.   Was Hammer a VWR employee?
(2) A.   No.
(3) Q.   Who did he work for?
(4) A.   THG.
(5) Q.   Got it. Little thick, but I get
(6) there.
(7) How about John?
(8) A.   John is VWR.
(9) Q.   And how about, was Sonny the trucker,
(10) as you called it before?
(11) A.   Yes.
(12) Q.   And how about Preston, was he a THG?
(13) A.   THG.
(14) Q.   So Melissa was a VWR employee who had
(15) the shipper job?
(16) A.   Correct.
(17) Q.   John was a VWR employee who had the
(18) receiver job?
(19) A.   Correct.
(20) Q.   And Sonny was a VWR employee who had
(21) the trucker job?
(22) A.   Mm-hmm.
(23) Q.   And Rachel was the supervisor, also
(24) employed by VWR?

## Page 149

(1)   **A.**   Correct.
(2)   **Q.**   How long did you do the receiver job
(3)   at Chestnut Run?
(4)   **A.**   From December to February of '03.
(5)   **Q.**   And you had told me earlier that you
(6)   had seen Dr. O'Brien?
(7)   **A.**   Correct.
(8)   **Q.**   In October, November of 2002?
(9)   **A.**   Correct.
(10)  **Q.**   And that as of that time, you
(11)  considered that you were disabled or unable to do
(12)  the jobs, the job of a receiver; is that right?
(13)  **A.**   Correct. Shipper, yes.
(14)  **Q.**   A shipper or receiver?
(15)  **A.**   Shipper, mm-hmm.
(16)  **Q.**   Did you think you could do the job of
(17)  a receiver?
(18)  **A.**   Not really.
(19)  **Q.**   I wouldn't think so. You described it
(20)  basically the same way, except you are just doing
(21)  scanning.
(22)  **A.**   Yes.
(23)  **Q.**   So you couldn't do either of those
(24)  jobs, right?

## Page 150

(1)   **A.**   Correct.
(2)   **Q.**   What was it that you were unable to
(3)   do? I mean, let's talk about the shipper job. You
(4)   were unable to lift; is that fair?
(5)   **A.**   Correct.
(6)   **Q.**   You were unable to bend or squat or do
(7)   that kind of stuff, right?
(8)   **A.**   Correct.
(9)   **Q.**   Were you able to climb?
(10)  **A.**   I was able to. Difficulty, but I was able
(11)  to climb.
(12)  **Q.**   But that was the thing that you did
(13)  very – like two times a week maybe?
(14)  **A.**   Right.
(15)  **Q.**   What about the stuff that was a daily
(16)  event, in terms of, you told me about pushing and
(17)  pulling, you know, hand carts or pallets and things
(18)  of that sort; you weren't able to do that?
(19)  **A.**   No.
(20)  **Q.**   And then on the scanning side, since
(21)  that's part of receiver, do I understand that you
(22)  were unable to do that as well?
(23)  **A.**   Unable to, but I had to do it.
(24)  **Q.**   So let's talk about that, okay? When

## Page 151

(1)   you say that you had to do it, what are you
(2)   referring to?
(3)   **A.**   That items had to get off the pallet,
(4)   scanned in, and directed out to where they're
(5)   supposed to go.
(6)   **Q.**   And who were you getting your
(7)   instructions from?
(8)   **A.**   Rachel.
(9)   **Q.**   That's Ms. Talmo?
(10)  **A.**   Yes.
(11)  **Q.**   When you say items had to be moved,
(12)  was there any limitation on the weight that you were
(13)  handling?
(14)  **A.**   She knew I couldn't go over 10 pounds, but
(15)  the pallets had different size boxes on it. Some
(16)  times the heavy ones would be at the top and light
(17)  ones would be at the bottom.
(18)  **Q.**   Did you ever lift anything that was
(19)  over 10 pounds?
(20)  **A.**   No.
(21)  **Q.**   You didn't?
(22)  **A.**   I pushed them, and I asked for help once
(23)  in a while, but most of the time I just pushed the
(24)  boxes.

## Page 152

(1)   **Q.**   Let me be clear on this. In terms of
(2)   the lifting that you did, that you never lifted
(3)   anything over 10 pounds.
(4)   **A.**   I tried not to.
(5)   **Q.**   Did you ever lift anything over
(6)   10 pounds?
(7)   **A.**   Yes.
(8)   **Q.**   Did anyone ever tell you you had to
(9)   lift something over 10 pounds?
(10)  **A.**   I was told that it had to be done.
(11)  **Q.**   Did anyone ever tell you that you had
(12)  to lift something that was over 10 pounds?
(13)  **A.**   No.
(14)  **Q.**   You say that you pushed something that
(15)  had a weight greater than 10 pounds?
(16)  **A.**   Yes.
(17)  **Q.**   That's your testimony?
(18)  **A.**   Yes.
(19)  **Q.**   Did anyone ever tell you that you had
(20)  to push something that had a greater weight than
(21)  10 pounds?
(22)  **A.**   No.
(23)  **Q.**   Did I hear you to say that you pulled
(24)  things that were greater than 10 pounds?

Page 153

(1)  **A.**  Yes.
(2)  **Q.**  Did anyone ever tell you that you had
(3)  to pull materials that were greater than 10 pounds?
(4)  **A.**  No.
(5)  **Q.**  Now, you say that you worked in the
(6)  warehouse at Chestnut Run from December, at the time
(7)  that your computer inventory job, that project
(8)  ended?
(9)  **A.**  Correct.
(10)  **Q.**  Up until February of 2003?
(11)  **A.**  Correct.
(12)  **Q.**  And over that time period, how many
(13)  times did you lift something that was greater in
(14)  weight than 10 pounds?
(15)  **A.**  I don't know.
(16)  **Q.**  Was it once or more than once?
(17)  **A.**  It was more than once.
(18)  **Q.**  How many more than once?
(19)  **A.**  Maybe like two to three a day.
(20)  **Q.**  Two to three a day?
(21)  **A.**  Yes.
(22)  **Q.**  Now, on any of those occasions, did
(23)  you ever ask anyone for help, in terms of your
(24)  co-workers?

Page 155

(1)  **Q.**  And that's from the December until the
(2)  February of 2003 time frame?
(3)  **A.**  Four times that I lifted something heavy?
(4)  **Q.**  Without help, yes, over that span of
(5)  time.
(6)  **A.**  No. I'm sorry. It was more than that
(7)  then.
(8)  **Q.**  What were you referring to?
(9)  **A.**  I thought you were talking about every
(10)  day, daily.
(11)  **Q.**  I'm totally confused now. You told me
(12)  that you lifted two or three times a day?
(13)  **A.**  Right.
(14)  **Q.**  And then I asked you if anyone helped
(15)  you, and you told me that they did?
(16)  **A.**  Yes.
(17)  **Q.**  And any time you asked, you got help?
(18)  **A.**  Correct.
(19)  **Q.**  But there were some times you didn't
(20)  ask for help, and you lifted it anyway, right?
(21)  **A.**  Right.
(22)  **Q.**  And I asked you how many times, and
(23)  you said four times; is that right?
(24)  **A.**  I can't remember. I can't remember.

Page 154

(1)  **A.**  Yes.
(2)  **Q.**  Who did you ask for help?
(3)  **A.**  Well, not co-worker, but Hammer I asked a
(4)  couple of times, whoever was in the area.
(5)  **Q.**  So you asked Hammer to help. And did
(6)  he do it?
(7)  **A.**  Yes.
(8)  **Q.**  Was there ever a time that he refused
(9)  to help you?
(10)  **A.**  No.
(11)  **Q.**  Was there ever a time, in terms of the
(12)  two or three times that day that you say you lifted
(13)  something heavier than 10 pounds, was there ever a
(14)  time when you did that without help from somebody?
(15)  **A.**  Yes.
(16)  **Q.**  And let's focus on those times.
(17)  How many times would you say
(18)  without help you lifted anything that was more than
(19)  10 pounds?
(20)  **A.**  I don't remember.
(21)  **Q.**  A couple?
(22)  **A.**  It was about more than a couple.
(23)  **Q.**  Four or five times?
(24)  **A.**  It was about four times.

Page 156

(1)  **Q.**  As you sit here today, can you tell me
(2)  how many times you lifted something without asking
(3)  for help where the weight was greater than
(4)  10 pounds?
(5)  And, again, I'm focusing on the
(6)  time frame from late December, after your computer
(7)  inventory assignment ended, up until the time of
(8)  February 2003.
(9)  **A.**  About 10.
(10)  **Q.**  About 10 times?
(11)  **A.**  Yes.
(12)  **Q.**  Why didn't you ask for help on those
(13)  occasions?
(14)  **A.**  There was nobody around.
(15)  **Q.**  Why didn't you wait?
(16)  **A.**  It had to get done.
(17)  **Q.**  Why didn't you call somebody?
(18)  **A.**  Because they were doing what they're
(19)  supposed to be doing.
(20)  **Q.**  Any other reason why you didn't seek
(21)  help?
(22)  **A.**  No.
(23)  **Q.**  Did you ever complain to anyone that
(24)  you weren't getting help?

Page 157

(1)  **A.**  Yes.
(2)  **Q.**  Who did you explain to?
(3)  **A.**  There's – well, Sonny, Hammer, Preston.
(4)  **Q.**  And what – go ahead. I'm sorry. I
(5)  didn't mean to interrupt. Anybody else?
(6)  **A.**  Melissa.
(7)  **Q.**  And did you say basically the same
(8)  thing to all of these individuals?
(9)  **A.**  Yes.
(10)  **Q.**  And what was it you said?
(11)  **A.**  That it's known that I had weight
(12)  requirements, but I wasn't getting any help, and the
(13)  stuff still had – it was a turn-around, so you had
(14)  to get the stuff in and out.
(15)  **Q.**  Did you ever go to Ms. Talmo and say
(16)  you weren't getting help?
(17)  **A.**  No.
(18)  **Q.**  Did you ever go to human resources and
(19)  say you weren't getting help?
(20)  **A.**  No.
(21)  **Q.**  Did you ever go to anyone in
(22)  management at VWR and say you weren't getting
help?
(23)  **A.**  I don't recall, no.
(24)  **Q.**  And why didn't you go to anyone in

Page 158

(1)  management, including Ms. Talmo, or anyone in HR
to
(2)  say you weren't getting help?
(3)  **A.**  I don't know.
(4)  **Q.**  Let me show you your complaint and
(5)  Paragraph 20 of your complaint, if I could. I want
(6)  to ask you to read that. I want to ask you, more
(7)  importantly, to reflect on it, and I want to ask you
(8)  sitting here now under oath whether that's a true
(9)  statement.
(10)  (Brief pause.)
(11)  **THE WITNESS:**  Yes, I believe it
(12)  was.
(13)  **BY MS. LEVERING:**
(14)  **Q.**  Who at VWR are you saying conspired?
(15)  **A.**  Rachel.
(16)  **Q.**  Anyone else?
(17)  **A.**  Mike Finocchairo.
(18)  **Q.**  Anyone else?
(19)  **A.**  No.
(20)  **Q.**  Did you know Ms. Talmo before you
(21)  worked on the warehouse floor at Chestnut Run?
(22)  **A.**  No, I hadn't met her before.
(23)  **Q.**  What are you claiming that
(24)  Mr. Finocchairo and Ms. Talmo did between

Page 159

(1)  October 28th and November 13th of 2002 that you
(2)  considered to be a conspiracy?
(3)  **A.**  That they had a hard time with the light
(4)  duty, and they'd get me back in to do the work, and
(5)  then ease me back out into – just let me back on to
(6)  the floor to do the shipping area with my normal
(7)  requirements that I'm supposed to do.
(8)  **Q.**  And what knowledge do you have that
(9)  Ms. Talmo knew anything about you or your situation
(10)  before you were over in Chestnut Run?
(11)  **A.**  Well, I know I told her that I had a
(12)  weight requirement from the doctor. I don't know if
(13)  she was told before I got over there or not.
(14)  **Q.**  Well, you didn't tell her until some
(15)  time in December at the earliest; isn't that right?
(16)  **A.**  In December? True.
(17)  **Q.**  And other than your speculating that
(18)  Mr. Finocchairo and Ms. Talmo did something in that
(19)  time frame, are there any particular facts as you
(20)  believe them to be true that you can point to to
(21)  substantiate that allegation?
(22)  **A.**  No.
(23)  **Q.**  What are you saying that they did that
(24)  made your work environment so miserable and so

Page 160

(1)  hostile?
(2)  **A.**  Just putting me back out on the floor with
(3)  no help, nobody cared. Many times I've asked for a
(4)  passkey; never did get a passkey to get in. Always
(5)  had to knock or somebody would be in the area. I
(6)  had to wait for somebody to be at the door to get
(7)  in.
(8)  **Q.**  When you say back out on the floor,
(9)  you are talking about when you moved back into the
(10)  warehouse area in Chestnut Run in December of
2002;
(11)  is that what you mean by back out on the floor?
(12)  **A.**  Correct.
(13)  **Q.**  And when you say no help, you are
(14)  referring to what you've already testified to under
(15)  oath concerning that you never went to her or
anyone
(16)  else in HR or anyone in management?
(17)  **A.**  Correct.
(18)  **Q.**  And the passkey is what?
(19)  **A.**  It's a key to get into the door, to the
(20)  warehouse.
(21)  **Q.**  To get into the warehouse?
(22)  **A.**  Mm-hmm. Yes.
(23)  **Q.**  And who did you ask for a passkey?
(24)  **A.**  I first asked David Gibson and then second

Page 161

(1) time with Rachel.
(2) **Q.** And you asked Gibson for the passkey
(3) when?
(4) **A.** When I first got there in November.
(5) **Q.** So around November the 13th?
(6) **A.** Correct.
(7) **Q.** And then did he refuse to give it to
(8) you?
(9) **A.** No. He was going to assign me a passkey.
(10) **Q.** So he didn't refuse to assign you a
(11) passkey –
(12) **A.** He never got around to it.
(13) **Q.** Never got around to it?
(14) **A.** Yes.
(15) **Q.** Did you ever go back to him and say
(16) Dave, I don't have it yet?
(17) **A.** Yes.
(18) **Q.** How many times did you do that?
(19) **A.** Probably about three times.
(20) **Q.** Are you suggesting he intentionally
(21) failed to give you a passkey?
(22) **A.** No, not intentionally.
(23) **Q.** It's just that he never got around to
(24) it?

Page 162

(1) **A.** Correct.
(2) **Q.** At some point you asked Ms. Talmo for
(3) a passkey, as well?
(4) **A.** Correct.
(5) **Q.** And that would have been after your
(6) computer inventory assignment had ended?
(7) **A.** Correct.
(8) **Q.** So that would have been some time in
(9) the last part of, what, December of 2002?
(10) **A.** Yes.
(11) **Q.** And did she ever refuse to give it to
(12) you?
(13) **A.** She never got around to doing it.
(14) **Q.** And, again, you are not suggesting
(15) that there was anything intentional about that, are
(16) you?
(17) **A.** No.
(18) **Q.** Anything else you are referring to
(19) that you say that it was done to make your work
(20) environment miserable and hostile, other than what
(21) we've already gone through in terms of the help
(22) issue, being back on the floor and the issue about
(23) the passkey?
(24) **A.** Well, when I was doing the light work

Page 163

(1) duty, for at least 2 days in a row that I would just
(2) sit there and do nothing in the room, and they know
(3) I sit there and wait for some work to be given to me
(4) for me to do, and I just sit in a room or try and
(5) walk around or whatever.
(6) **Q.** So you are at work and you are being
(7) paid, right?
(8) **A.** Correct.
(9) **Q.** And you think your life was made
(10) miserable because you aren't asked to perform any
(11) activities on 2 days?
(12) **A.** There was more than 2 days. Each week was
(13) a different day, and most of the time I didn't have
(14) any work to do. I would just sit there.
(15) **Q.** What work was there that you thought
(16) you could do?
(17) **A.** I was there to do the inventory work.
(18) **Q.** That was over. We already talk about
(19) that.
(20) **A.** During it, when I was doing the inventory
(21) work, there was hardly no work to be – when I was
(22) doing it. So then when that was over and then I was
(23) out on the floor.
(24) **Q.** So I am just struggling with why

Page 164

(1) that's making your life miserable in terms of the
(2) inventory work.
(3) **Q.** Did the flow of paperwork where
(4) the information that you were supposed to kind of
(5) input into the computer, did that just get less and
(6) less as time went on?
(7) **A.** Correct.
(8) **Q.** And did that have anything to do with
(9) anything other than the fact the project was coming
(10) to an end?
(11) **A.** I don't know if it was coming to an end.
(12) Nobody was telling me anything. I would just sit
(13) there, and nobody would tell me am I going to have
(14) work today or not going to have work today.
(15) **Q.** Did you ask?
(16) **A.** Yes. I contacted Dave many of times.
(17) **Q.** Did he tell you?
(18) **A.** He said he'll, first chance he gets, he
(19) will come, he is downstairs, he would come upstairs
(20) to talk over what was going on, and then he would
(21) get side-tracked and I wouldn't see him.
(22) **Q.** You are not suggesting his not coming
(23) up to you on those occasions was anything
(24) intentional on his part, are you?

## Page 165

(1)  **A.**   No.
(2)  **Q.**   So there were days you weren't sure in
(3)  terms of what was going to be expected of you in
(4)  terms of what work assignment you would be asked to
(5)  do, and you'd ask for some explanation, and that
(6)  explanation would not be forthcoming.
(7)  Anything else that you suggest,
(8)  other than the things you've already talked about,
(9)  anything else that you suggest happened that made
(10) your work environment so hostile and miserable?
(11) **A.**   No.
(12) **THE WITNESS:**   Can I go to the
(13) bathroom?
(14) **MS. LEVERING:**   Sure. We will
(15) take a short break.
(16)    (Short recess taken at
(17) 3:25 p.m.)
(18)    (Proceedings resumed at
(19) 3:30 p.m.)
(20) **BY MS. LEVERING:**
(21) **Q.**   Can you look at Paragraph 22 of the
(22) complaint. You see you make reference there to a
(23) new supervisor?
(24) **A.**   Yes.

## Page 166

(1)  **Q.**   Is that Ms. Talmo?
(2)  **A.**   Yes.
(3)  **Q.**   And you told me earlier that Ms. Talmo
(4)  never asked you to lift any boxes beyond your
(5)  ability; isn't that right?
(6)  **A.**   She never – I'm sorry.
(7)  **Q.**   She never specifically asked you to
(8)  lift any boxes above your restriction; isn't that
(9)  right?
(10) **A.**   Right.
(11) **Q.**   So reading what you have written in
(12) Paragraph 22, saying that she did, that is not true;
(13) isn't that right?
(14) **A.**   No, she didn't demand.
(15) **Q.**   Not only did she not demand, she
(16) didn't even tell you to lift anything above your
(17) restriction; isn't that right?
(18) **A.**   She didn't say get the boxes out.
(19) **Q.**   She never told you to lift anything
(20) above your restriction; isn't that right? You are
(21) under oath, Ms. Carper.
(22) **A.**   Mm-hmm. She didn't say not to lift boxes.
(23) **Q.**   She never told you to lift the boxes;
(24) isn't that right?

## Page 167

(1)  **MS. JONES:**   I'm going to object
(2)  at this point in time. Asked and
(3)  answered.
(4)  **MS. LEVERING:**   I think she has
(5)  answered it before. I think she's
(6)  answered it under oath.
(7)  **BY MS. LEVERING:**
(8)  **Q.**   Are you changing your earlier
(9)  testimony, Ms. Carper?
(10) **A.**   No.
(11) **Q.**   Thank you. It says in Paragraph 22
(12) that you objected to Ms. Talmo citing your medical
(13) inability to do so. You never did any such thing;
(14) isn't that right?
(15) **A.**   You mean did I tell her?
(16) **Q.**   That's right.
(17) **A.**   Yes, I did.
(18) **Q.**   When did you do that? I'm not talking
(19) about you giving a doctor's note. I'm talking about
(20) what you allege, that you objected, and you cited
(21) your medical inability to do so. That never
(22) happened, did it?
(23) **A.**   Yes, I did tell her.
(24) **Q.**   When?

## Page 168

(1)  **A.**   I don't remember. December.
(2)  **Q.**   Did you object?
(3)  **A.**   To lifting a box?
(4)  **Q.**   How do you object to something when
(5)  you've already testified that she never asked you to
(6)  do it?
(7)  **A.**   What, that I told her I couldn't lift a
(8)  box?
(9)  **Q.**   You just testified that your earlier
(10) testimony was accurate, that you were telling the
(11) truth when you earlier said Ms. Talmo never asked
(12) you to lift any boxes above your restriction.
(13) I'm asking you, if that
(14) testimony is true, which I believe it is, then how
(15) do you possibly allege that you objected to her
(16) doing something that you you now admit she never did?
(17) **A.**   I don't get it.
(18) **Q.**   It never happened, did it?
(19) **A.**   Yes, it did.
(20) **Q.**   What do you think you are referring to
(21) in this paragraph? You tell me. What happened
(22) according to you?
(23) **A.**   That I did tell her that I couldn't lift
(24) any heavy boxes.

## Page 169

(1) Q. Fair enough. And she never asked you
(2) to do it. So how do you object to her?
(3) A. She didn't ask, but it was required of me
(4) to do the shipping work out there on the shipping,
(5) with the boxes.
(6) Q. I understand that your testimony is
(7) that you continued to do it. We also know your
(8) testimony to be that she never asked you to do it.
(9) My question is, what are you
(10) referring to with the use of the word "objected" in
(11) that paragraph?
(12) A. I don't know.
(13) Q. Did you ever tell Dr. Dear or
(14) Dr. Dear's office that you wanted a note from her
(15) that basically said you could only do clerical work?
(16) A. Yes.
(17) Q. And when did you do that?
(18) A. I want to say January '03.
(19) Q. And why did you do that?
(20) A. So I wouldn't be putting pressure on my
(21) back, doing shipping work.
(22) Q. And did Dr. Dear give you any such
(23) note?
(24) A. There was a weight requirement of what,

## Page 170

(1) 5 pounds?
(2) Q. No. You are asking for a note that
(3) says I can only do clerical work. Isn't it a fact
(4) that Dr. Dear said she couldn't give you such a
(5) note?
(6) A. No, not for clerical. Just for light
(7) duty.
(8) Q. So we agree she told you she couldn't
(9) give you a note that said clerical duty only, right?
(10) A. Correct.
(11) Q. My understanding is that at some time
(12) in early February of 2003, you stopped coming to
(13) work; is that right?
(14) A. Early February? No, I was coming to work.
(15) Q. In some time in February of 2003, did
(16) you stop coming to work?
(17) A. No, I went to work.
(18) Q. Did there come a point in time when
(19) you didn't continue to come to work?
(20) A. After the 6th.
(21) Q. Okay. After the 6th of February?
(22) A. Right.
(23) Q. And what happened on the 6th of
(24) February?

## Page 171

(1) A. Rachel told me that there was no more work
(2) for me to do and that they were sending me home.
(3) Q. Did she say anything else?
(4) A. No. I had to sign some papers, and that
(5) was it.
(6) Q. Did you talk to anyone other than
(7) Ms. Talmo that day?
(8) A. That day, Keith.
(9) Q. Was he at Chestnut Run, or did you
(10) call him?
(11) A. I called him.
(12) Q. And what did you say to him?
(13) A. I asked him what was going on and did he
(14) know anything about them letting me go, and he
(15) didn't know anything about it.
(16) Q. What do you mean letting you go? What
(17) do you mean by that?
(18) A. Putting me out of work, that they didn't
(19) have no more work for me to do.
(20) Q. No one ever told you you were
(21) terminated, did they?
(22) A. No.
(23) Q. And you didn't understand that you had
(24) been terminated, did you?

## Page 172

(1) A. Nobody told me I was terminated.
(2) Q. And you didn't understand that you
(3) were terminated; isn't that right?
(4) A. They told me that I was getting put out
(5) for medical leave.
(6) Q. Medical leave. Other than Mr. Steed
(7) and Ms. Talmo, anyone else that you spoke to?
(8) A. About that, no.
(9) Q. Did you have any disagreement,
(10) Ms. Carper, that there was no work that you could do
(11) and that you should continue to be out on medical
(12) leave?
(13) **MS. JONES:** Object to the form
(14) of the question.
(15) **BY MS. LEVERING:**
(16) Q. You can answer it.
(17) A. Did I have disagreement?
(18) Q. Yes. Did you think you should be out
(19) on medical leave?
(20) A. No.
(21) Q. Did you think you should be lifting
(22) boxes that you say you couldn't lift?
(23) A. No.
(24) Q. What did you think you should be

## Page 173

(1) doing?

(2) **A.** Office work, any type of office work they

(3) had, VWR.

(4) **Q.** Clerical work?

(5) **A.** Clerical.

(6) **Q.** Something other than your shipping

(7) work or your receiving work?

(8) **A.** Correct.

(9) **Q.** Did you see if there were any

(10) vacancies in any clerical positions at VWR at the

(11) time?

(12) **A.** Yes.

(13) **Q.** In February of 2003?

(14) **A.** Yes.

(15) **Q.** And how did you go about doing that?

(16) **A.** Through the Internet.

(17) **Q.** And did you determine that there were

(18) any such vacancies?

(19) **A.** No, there wasn't.

(20) **Q.** So you didn't apply for any clerical

(21) positions because there were none to apply for at

(22) that time; is that right?

(23) **A.** Correct.

(24) **Q.** When you talked with Ms. Talmo on

## Page 174

(1) February 6th, did you say it was, of 2003?

(2) **A.** Yes.

(3) **Q.** What time of day was that?

(4) **A.** Before 12.

(5) **Q.** Before 12 noon?

(6) **A.** Yes.

(7) **Q.** And had you come to work at the 7:30

(8) time, the usual time?

(9) **A.** Yes.

(10) **Q.** And what were you doing from 7:30 to

(11) noon?

(12) **A.** Receiving.

(13) **Q.** Was there anything unusual about that

(14) morning?

(15) **A.** No.

(16) **MS. LEVERING:** Let me ask the

(17) reporter to mark as Defendant's 17 a

(18) February 7, 2003 letter from Steven

(19) Knepper to Ms. Carper.

(20) (Whereupon D-17 was marked for

(21) identification.)

(22) **BY MS. LEVERING:**

(23) **Q.** By the way, Ms. Carper, as you are

(24) looking at that letter, you didn't hurt your back or

## Page 175

(1) re-injure your back on February the 6th, did you?

(2) **A.** No, not the 6th.

(3) **Q.** At some time?

(4) **A.** A few days before that.

(5) **Q.** When?

(6) **A.** That Monday.

(7) **Q.** What did you do?

(8) **A.** Reaching to get boxes off the pallet.

(9) **Q.** Did anyone witness this?

(10) **A.** No.

(11) **Q.** Did you tell Ms. Talmo or any other

(12) member of management about a reinjury to your back

(13) on the 4th or whenever it was?

(14) **A.** No, just my doctor.

(15) **MS. JONES:** Can we go off the

(16) record for a second? I'm sorry.

(17) (Discussion off the record)

(18) **BY MS. LEVERING:**

(19) **Q.** And the doctor you are referring to is

(20) Dr. Dear?

(21) **A.** Yes.

(22) **Q.** You have before you Defendant's 17.

(23) This is a letter you received from Mr. Knepper?

(24) **A.** Yes.

## Page 176

(1) **Q.** And it confirms the fact that you are

(2) on a leave of absence, medical leave of absence?

(3) **A.** Yes.

(4) **Q.** And after you received this letter

(5) from Mr. Knepper, did you have any subsequent

(6) contact with him?

(7) **A.** With Mr. Knepper, yes.

(8) **Q.** And when did you have contact with

(9) him?

(10) **A.** Just signing out the forms that he sent me

(11) later on.

(12) **Q.** And the forms were in connection with

(13) your long-term disability claim?

(14) **A.** Yes.

(15) **Q.** Any other contact you had with him?

(16) **A.** That was it.

(17) **Q.** Other than Mr. Knepper, any contact

(18) with any other person associated with human

(19) resources at VWR after February 6th of 2003?

(20) **A.** No. He was the only one I was contacted

(21) with.

(22) **Q.** How about any contact with any other

(23) member of management of VWR after February 6th of

(24) 2003, other than Mr. Knepper, anyone?

## Page 177

(1) **A.** I can't remember her name. Payroll
(2) department. I can't think of her name.
(3) **Q.** Did you contact the payroll department
(4) at some time, or did they contact you?
(5) **A.** They contacted me.
(6) **Q.** Do you know why they contacted you?
(7) **A.** About my medical coverage.
(8) **Q.** And what was it about the medical
(9) coverage?
(10) **A.** That I would have to pay them until the
(11) disability kicked in.
(12) **Q.** Any other topic of discussion between
(13) you and any other one at VWR, other than the
(14) conversation with Knepper concerning long-term
(15) disability and with payroll concerning the medical
(16) coverage?
(17) **A.** No.
(18) **Q.** Now, in the letter, I'm sorry,
(19) Defendant Exhibit 17, the letter from Mr. Knepper to
(20) you, it tells you in terms of the 90-day duration of
(21) your medical leave; do you see that?
(22) **A.** Yes.
(23) **Q.** Did you ever make any attempt to
(24) return to the employ of VWR during that time period?

## Page 178

(1) **A.** No, not – no.
(2) **Q.** Now, my understanding is that at some
(3) point, and I think it was in May of 2003, you filed
(4) a claim for unemployment compensation benefits; is
(5) that right?
(6) **A.** Yes.
(7) **Q.** And why did you do that?
(8) **A.** Because I wasn't getting anything from the
(9) disability people, wasn't nothing coming in at that
(10) time, so I figured I can do unemployment.
(11) **Q.** Did you consider yourself employed at
(12) VWR at that time?
(13) **A.** In May, no, I didn't consider myself being
(14) employed.
(15) **Q.** You did not or did?
(16) **A.** I didn't.
(17) **Q.** Did not. And what caused you to think
(18) that you were no longer employed?
(19) **A.** When they had put me – well, when they
(20) told me that there was no more work for me to do and
(21) they put me on medical leave.
(22) **Q.** Well, you understand, don't you, that
(23) if you were physically able to come back to work,
(24) that you could have come back to work during the

## Page 179

(1) time, that 90-day time period after your medical
(2) leave began?
(3) **A.** Correct.
(4) **Q.** But you didn't do that, didn't make
(5) any attempts to do that, right?
(6) **A.** Correct.
(7) **Q.** You never resigned from VWR, did you?
(8) **A.** No.
(9) **Q.** You never quit, did you?
(10) **A.** No.
(11) **Q.** Would you be good enough to turn to
(12) Paragraph 26 of your complaint. It's on the bottom
(13) of page 5. It concerns your workers' compensation
(14) benefit claim?
(15) **A.** Yes.
(16) **Q.** What are you referring to when you say
(17) that VWR initiated proceedings to terminate your
(18) benefits? What are you saying happened?
(19) **A.** From this letter, 16, Exhibit 16.
(20) **Q.** Oh, you are referring to the letter
(21) that said that they didn't have enough information
(22) and they needed you to sign an authorization?
(23) **A.** Correct.
(24) **Q.** So you are referring to what we've

## Page 180

(1) marked before as Defendant's 15 and 16? Fifteen is
(2) this authorization form that you signed.
(3) **A.** Correct.
(4) **Q.** Other than the reference to that
(5) situation, are you referring to anything else?
(6) **A.** No.
(7) **Q.** Have you worked anywhere since
(8) February 6th of 2003?
(9) **A.** No.
(10) **Q.** You provided us with a document – did
(11) you apply for any positions since February 6th of
(12) 2003?
(13) **A.** Yes.
(14) **Q.** And how many positions did you apply
(15) for?
(16) **A.** One.
(17) **Q.** And was that the receptionist job at
(18) VWR?
(19) **A.** Yes.
(20) **Q.** And do you know who got that job?
(21) **A.** No, I don't.
(22) **Q.** Do you know why you didn't get that
(23) job?
(24) **A.** No, I don't.

Page 201

(1) of my usual stipulation.
(2) **MS. LEVERING:**    All right. Well,
(3) then she will read it.
(4) **MS. JONES:**    Right.
(5) **MS. LEVERING:**    If there's
(6) anything other than a typographical change
(7) that she makes to anything, I want your
(8) commitment that I redepose her.
(9) **MS. JONES:**    That's fine.
(10) **MS. LEVERING:**    I also forewarn
(11) you in terms of, you know, there should
(12) not be substantive changes to the
(13) testimony. That will lead to different
(14) kinds of proceedings.
(15)    (Deposition concluded at
(16) 4:50 p.m.)
(17) - - - - -
(18)
(19)
(20)
(21)
(22)
(23)
(24)

Page 202

(1) I, LOUIS A. MANCHELLO, Certified
(2) Shorthand Reporter (License No. XI01418) and
Notary
(3) Public of New Jersey, and Commissioner of Deeds of
(4) Pennsylvania, do hereby certify the foregoing to be a
(5) true and correct transcript of the proceedings held
(6) in this matter as transcribed from the stenographic
(7) notes taken by me on Thursday, March 10, 2005.
(8)
(9)
(10) Louis A. Manchello
    Certified Shorthand Reporter
(11)    (N.J. License No. XI01418)
(12) Date: March 16, 2005
(13)
(14)    (This certification does not
(15) apply to any reproduction of this
(16) transcript, unless under the direct
(17) supervision of the certifying reporter.)
(18)
(19)
(20)
(21)
(22)
(23)
(24)

Page 203

(1) CERTIFICATE
(2) -------------------------------------------------
(3) I, the undersigned, MICHELLE R. CARPER,
(4) do hereby certify that I have read the foregoing
(5) deposition and that to the best of my knowledge, said
(6) deposition is true and accurate (with the exception
(7) of the following corrections listed below):
(8) -------------------------------------------------
(9) Page Line
(10)       :
(11)       :
(12)       :
(13)       :
(14)       :
(15)       :
(16)       :
(17)       :
(18)       :
(19)       :
(20)       :
(21)       :
(22)
(23)

       DATE MICHELLE R. CARPER
(24)